[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14048
_____

D.C. Docket No. 1:17-cv-23429-MGC

MICHAEL LAVIGNE, JENNIFER LAVIGNE, CODY PYLE, JENNIFER
RIBALTA, JEFF RODGERS, PATRICIA RODGERS, IZAAR VALDEZ, FELIX
VALDEZ,

Plaintiffs-Appellees,

versus

HERBALIFE, LTD, et al.,

Defendants,

MARK ADDY, JILLIAN ADDY, DENNIS DOWDELL, GARRAIN S. JONES,
CODY MORROW, CHRISTOPHER REESE, GABRIEL SANDOVAL, EMMA
SANDOVAL, JOHN TARTOL, LESLIE R. STANFORD, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 29, 2020)

Before MARTIN, NEWSOM, and O'SCANNLAIN,[*] Circuit Judges.

O'SCANNLAIN, Circuit Judge:

In this class action dispute among distributors of Herbalife products, we must decide whether the district court properly denied a motion to compel arbitration.

I

Herbalife, Ltd.; Herbalife International, Inc.; and Herbalife International of America, Inc. (henceforth, "Herbalife") describe themselves as a global nutrition company that operates through a direct sales network of many thousands of independent distributors, also known as Herbalife "members." These distributors are told that, through hard work and an effective sales strategy, they can achieve substantial, ongoing income by selling Herbalife products. In 2017, Patricia and Jeff Rodgers, Jennifer and Michael Lavigne, Cody Pyle, Izaar and Felix Valdez, and Jennifer Ribalta (hereinafter, the "aggrieved distributors") filed this putative class action in the Southern District of Florida against Herbalife, as well as forty-four individuals who are alleged to be Herbalife's top-earning distributors (hereinafter, the "top distributors").

A

---

[*] Honorable Diarmuid F. O'Scannlain, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

The aggrieved distributors entered into six distributor agreements with Herbalife. Patricia Rodgers filled out the paperwork to become an Herbalife member in June 2010. Some six months later, she claims, she traveled over a hundred miles to Orlando, Florida, to attend her first large Herbalife recruiting event, the "January Spectacular." According to Patricia, the keynote speaker at this event was a highly successful distributor who told the attendees that if they simply put in enough time, money, and effort, then they, too, could achieve life-changing financial success. Two months later, Patricia says, she attended another of these so-called "Circle of Success" events, this time with her husband, Jeff, in Daytona Beach. Over the next four years, Patricia and Jeff purportedly attended over fifty Circle of Success events, in which they were continuously assured by Herbalife's top distributors that success was just around the corner. Patricia and Jeff claim that, in their efforts to achieve their dreams, they moved from Miami to Jacksonville, cashed out a retirement account and a settlement annuity, sold jewelry, and borrowed money from family members. All told, Patricia and Jeff allege that they spent over $100,000 on Herbalife, including $20,000 on Circle of Success events.

Jennifer and Michael Lavigne share a similar story. In December 2014, Jennifer signed up to become an Herbalife member. The following month, she claims, she and her husband, Michael, attended their first Circle of Success event, the "January Kickoff" in Columbus, Ohio. Over the next year-and-a-half, they

3

purportedly attended one event every month, which they assert cost them over $5,000. Why keep going back? According to the Lavignes, the key to success was attending every single event (or so they were told).

Cody Pyle, who signed a distributor agreement with Herbalife in July 2014, says that he attended his first Circle of Success event in Norman, Oklahoma in November of that year. Over the next two years, he claims, he attended another twenty-five such events, where he was frequently told that the key to success was not only attending every event but also qualifying for VIP status by purchasing more Herbalife products. For three consecutive months, Pyle says, he tripled his Herbalife purchases, yet he never achieved his long-sought-after wealth. Instead, he claims that he lost over $30,000 on Herbalife, including $11,600 on traveling to and attending Circle of Success events.

Izaar Valdez and her father, Felix Valdez, claim that they became Herbalife members in 2008, when they attended a Circle of Success event in Miami and were lured in by assurances that, as members, they could make half-a-million dollars a year. (According to Herbalife, Izaar's membership lapsed in 2011 because she failed to pay an annual fee; she re-enrolled in 2013, but she again failed to pay the fee and her membership was terminated in 2016.) Felix claims that he subsequently sunk tens of thousands of dollars from his construction company into Herbalife. Izaar asserts that, in 2014, she spent over $3,500 attending Circle of Success events and

4

more than $10,000 purchasing Herbalife products so that she could qualify for VIP status at events. She also claims that her husband left her and her three children because of her financial losses. She says that when she sought the advice of her Circle of Success "mentors," they advised her to stay the course by continuing to attend events and to qualify for VIP treatment.

Jennifer Ribalta, who became an Herbalife member in 2011, claims that, beginning in February of that year, she attended one Circle of Success event per month for thirty-eight consecutive months. On thirty of these occasions, she purportedly worked on a "Production Team" where she helped to set up and manage the events, but she received no pay for doing so and she still had to purchase her own tickets. In total, she claims that she spent $15,000 on the Circle of Success.

B

As the aggrieved distributors tell it, their suit is not concerned with Herbalife's practice of selling products through independent distributors, which has already been the subject of a complaint by and settlement with the Federal Trade Commission. Rather, their complaint focuses on the "Circle of Success," which the aggrieved distributors claim is an ongoing enterprise between Herbalife and the top distributors that produces expensive monthly events in cities across the country. The purpose of these events, they contend, is to "disseminate misleading and fraudulent income claims," to "recruit new members into the fraudulent business opportunity scheme,"

5

and to "increase the investment and engagement of those already ensnared in the scheme." According to the aggrieved distributors, those who attend the Circle of Success events are told that the path to success as an Herbalife distributor is to "attend every event" and to "'qualify' for special treatment at these events by making large monthly purchases of Herbalife's products." However, they contend that, after spending thousands of dollars doing so, they have received no benefit whatsoever.

The aggrieved distributors purport to represent "[a]ll persons who purchased tickets to and attended at least two Circle of Success events from 2009 until the present, in pursuit of Herbalife's business opportunity." They claim that Herbalife and the top distributors who manage the Circle of Success violated the federal Racketeer Influenced and Corrupt Organizations Act by conducting the affairs of a racketeering enterprise, *see* 18 U.S.C. § 1962(c), and by conspiring to do so, *see id.* § 1962(d).[1]

1

A few months after the complaint was filed, Herbalife and the top distributors filed a Joint Motion to Compel Arbitration and, in the alternative, a Joint Motion to Transfer Venue to the Central District of California Pursuant to 28 U.S.C. § 1404(a).

---

[1] In addition to the federal claims, their complaint also includes a few state-law claims against Herbalife (but not the top distributors)—violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201–.213; unjust enrichment; and negligent misrepresentation—none of which is relevant to this appeal.

6

Attached to these motions were copies of the six distributor agreements signed by Patricia Rodgers, Cody Pyle, Felix Valdez, Izaar Valdez, Jennifer Lavigne, and Jennifer Ribalta. Although neither Jeff Rodgers nor Michael Lavigne ever signed a distributor agreement, Herbalife and the top distributors argued that each of them was bound by his wife's agreement because Herbalife allows spouses to operate only one distributorship per couple.

Each of the six distributor agreements contains a choice-of-law provision stating that the contract is governed by California law. Furthermore, each agreement purports to incorporate the Herbalife Rules of Conduct, including any modifications to such rules as Herbalife makes "in its sole and absolute discretion."

2

Only three of the six agreements contain an arbitration clause within the four corners of the contract. The first two, Jennifer Lavigne and Cody Pyle's agreements, state that that the distributor and Herbalife "agree to arbitrate all disputes and claims between them," including but not limited to "claims arising out of or relating to any aspect of the relationship between Herbalife and Member," as well as "claims by Member against Herbalife or Herbalife against Member which arise out of or relate in any way to any dispute between Member and another Herbalife Member." References to Herbalife include its "subsidiaries, affiliates, officers, directors, agents, employees, predecessors in interest, heirs, successors and assigns."

7

Arbitration is governed by the Commercial Arbitration Rules of the American Arbitration Association (AAA).

The third agreement with an arbitration clause, Felix Valdez's, states (according to Herbalife's translation of the original Spanish version): "Herbalife and I agree that any claim or dispute arising out of or related to my Distributorship, including, without limitation, my rights, obligations and relationships with Herbalife (including any of its corporate affiliates or any of their respective officers, directors or employees), and/or with other Distributors," shall be subject to arbitration, governed by the AAA's Commercial Arbitration Rules.

3

The distributor agreements signed by Patricia Rodgers, Izaar Valdez, and Jennifer Ribalta do not contain an arbitration clause within their four corners. Instead, each agreement contains a forum selection clause requiring any claim to be resolved in state or federal court in Los Angeles, California.

Nevertheless, Herbalife and the top distributors argued in the district court that all eight of the aggrieved distributors were required to arbitrate their claims because all six distributor agreements incorporate the arbitration clause contained in the updated Herbalife Rules of Conduct. Herbalife claimed that it first added an arbitration clause to its Rules in August 2013. It subsequently amended the Rules in May 2014 and November 2016, but both new versions retained an arbitration clause.

8

Because the aggrieved distributors agreed to be bound by any modifications to the Rules of Conduct, Herbalife and the top distributors argued in the district court that most of the aggrieved distributors were required to adhere to the arbitration clause in the 2016 Rules. That clause states that "Herbalife and Member agree to arbitrate all disputes and claims between them," including but not limited to "claims arising out of or relating to any aspect of the relationship between Herbalife and Member," as well as "claims by Member against Herbalife or Herbalife against Member which arise out of or relate in any way to any dispute between Member and another Herbalife Member." References to Herbalife include its "subsidiaries, affiliates, officers, directors, agents, employees, predecessors in interest, heirs, successors and assigns." Arbitration is governed by the AAA's Commercial Arbitration Rules.

Herbalife and the top distributors conceded in the district court that Izaar Valdez was not bound by the 2016 Rules because her membership expired in June 2016, five months before the amended Rules were published. Instead, they argued that she was bound by the arbitration clause in the 2014 Rules, which states that "Herbalife and Member agree to arbitrate all disputes and claims between them, including, but not limited to . . . claims that arise out of or relate to any aspect of the relationship between Herbalife and Member," as well as "claims that arise out of or relate to any dispute between Member and another Herbalife Member." As in the

9

2016 Rules, references to Herbalife include its "subsidiaries, affiliates, officers, directors, agents, employees, predecessors-in-interest, heirs, successors, and assigns," and arbitration is governed by the AAA's Commercial Arbitration Rules.

So, in summary, Herbalife and the top distributors argued in the district court that all eight of the aggrieved distributors were covered by the arbitration clauses in the 2016 or 2014 Rules of Conduct. They also argued that Jennifer and Michael Lavigne, Cody Pyle, and Felix Valdez were covered by the arbitration clauses contained within the four corners of their distributor agreements. Finally, to the extent that the district court might decline to compel arbitration of any of the aggrieved distributors' claims, Herbalife and the top distributors asked the court to transfer those remaining claims to the Central District of California.

C

In August 2018, the district court denied the motion to compel arbitration of the aggrieved distributors' claims against the top distributors,[2] and it also denied the motion to transfer those claims to the Central District of California.[3]

---

[2] As for the aggrieved distributors' claims against Herbalife, the district court granted the motion to compel arbitration of the claims by Jennifer and Michael Lavigne, Cody Pyle, and Felix Valdez. However, the district court denied the motion as to the claims against Herbalife by Patricia and Jeff Rodgers, Izaar Valdez, and Jennifer Ribalta. It concluded that, due to the implied covenant of good faith and fair dealing, it could not retroactively apply the arbitration clauses that were added to Herbalife's Rules of Conduct after the aggrieved distributors signed their distributor agreements.

[3] The district court granted the motion to transfer venue as to the claims by Patricia and Jeff Rodgers, Izaar Valdez, and Jennifer Ribalta against Herbalife.

10

The top distributors[4] now appeal the district court's order denying the motion to compel arbitration. They also ask us to exercise pendent appellate jurisdiction to review the denial of the motion to transfer venue.[5]

## II

Did the district court err in denying the top distributors' motion to compel arbitration?

### A

#### 1

The top distributors contend that under the plain language of the arbitration clauses, the aggrieved distributors agreed to arbitrate their claims against them. However, the top distributors have at least one major problem: None of them is a party to any of the distributor agreements they are attempting to invoke. The arbitration clauses at issue are agreements between the signatory and Herbalife, including Herbalife's subsidiaries, affiliates, officers, directors, agents, employees, predecessors in interest, heirs, successors, and assigns. Other Herbalife distributors are not included in any of these categories, and the top distributors do not argue

---

[4] Since Herbalife prevailed on its issues in the district court—i.e., the district court either compelled arbitration of the aggrieved distributors' claims against Herbalife or transferred those claims to a different venue—it is not a party to this appeal.

[5] We were informed by the parties that Jennifer and Michael Lavigne withdrew from the class action during the pendency of this appeal and that Jeff Rodgers recently passed away. However, their absence does not affect our analysis or conclusions.

11

otherwise. Under California law (which governs these agreements), "one must be a party to an arbitration agreement to be bound by it or invoke it." *Westra v. Marcus & Millichap Real Estate Inv. Brokerage Co.*, 28 Cal. Rptr. 3d 752, 754 (Ct. App. 2005). Because none of the top distributors is a party to any of the aggrieved distributors' agreements, they cannot invoke the agreements' arbitration clauses. Thus, the district court correctly denied the top distributors' motion to compel arbitration.

2

The top distributors further argue that the question of whether the aggrieved distributors agreed to arbitrate their claims against them is an issue of arbitrability that the arbitration clauses delegated to an arbitrator. The arbitration clauses at issue are governed by the AAA's Commercial Arbitration Rules, and, according to the top distributors, Rule 7 delegates all threshold questions of arbitrability to the arbitrator. Thus, the top distributors argue, when they introduced their motion to compel arbitration, the Federal Arbitration Act required the district court to send the case immediately to an arbitrator to decide whether the claims were subject to arbitration. However, the Act requires a court to send threshold questions of arbitrability to an arbitrator only when the parties have agreed to do so. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Because there was no contract, the aggrieved distributors have not agreed to anything with the top distributors. Consequently, the

12

district court was correct to resolve the motion to compel arbitration instead of immediately sending it to an arbitrator.

## B

The top distributors argue, in the alternative, that even though they do not have a contract with the aggrieved distributors, the district court should have forced the aggrieved distributors to arbitrate their claims under the doctrine of equitable estoppel.[6]

In the context of a motion to compel arbitration, the purpose of equitable estoppel is "to prevent a party from using the terms or obligations of an agreement as the basis for his claims against a nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another clause of that same agreement." *Goldman v. KPMG, LLP*, 92 Cal. Rptr. 3d 534, 543–44 (Ct. App. 2009). A non-signatory to an arbitration agreement may compel arbitration in one of two

---

[6] The parties dispute the standard of review to follow when a district court declines to apply equitable estoppel to compel arbitration. The aggrieved distributors contend that it is abuse of discretion because that is how we review a district court's exercise of its equitable powers. *Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 465 F.3d 1267, 1273 (11th Cir. 2006); *see also In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002) (holding that the district court did not abuse its discretion in declining to apply equitable estoppel to compel arbitration of federal RICO claims), *rev'd on other grounds*, *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003). The top distributors, however, argue that it is de novo. They cite a recent published opinion, *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017), which supposedly "clarified" that the denial of a motion to compel arbitration is always reviewed de novo, regardless of the proposed basis for compelling arbitration. Because the result would be the same under either standard of review, we need not and do not reach the issue.

circumstances: (1) when the plaintiff-signatory "must rely on the terms of the written agreement in asserting [its] claims," *id.* at 541 (alteration in original) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)); or (2) when the plaintiff-signatory alleges "substantially interdependent and concerted misconduct" by the signatories and non-signatories, and such alleged misconduct is "founded in or intimately connected with the obligations of the underlying agreement," *id.*

The top distributors argue that the aggrieved distributors rely directly on the terms of the distributor agreements in asserting their federal RICO claims. Because they are accused of misrepresenting the importance of attending Circle of Success events to succeeding as an Herbalife distributor, they contend that a detailed analysis of the distributor agreements is required to determine whether their statements are false. However, it is not enough for a plaintiff's allegations to rely "simply on the fact that an agreement exists"; the test is whether they "rely on or depend on 'the terms of the written agreement.'" *Id.* at 551–52 (quoting *MS Dealer*, 177 F.3d at 947). When a plaintiff fails even to mention any of the terms, much less discuss them in detail, we are hard-pressed to conclude that he or she relied on such terms. *See id.* at 551. Here, the aggrieved distributors' complaint references the Herbalife business opportunity and its compensation scheme, which might presuppose the existence of distributor agreements, but the complaint does not discuss a single term in the

14

agreements. Thus, we are not persuaded that there was any reliance on the agreements' terms.

As for whether the alleged "substantially interdependent and concerted misconduct" by the top distributors and Herbalife is "founded in or intimately connected with the obligations of the" distributor agreements, *id.* at 541, the top distributors restate their previous argument: Since they are accused of misrepresenting the importance of attending Circle of Success events to succeeding as an Herbalife distributor, determining whether their claims are false requires careful study of the distributor agreements. Put another way, succeeding as an Herbalife member necessarily entails performing the obligations of a distributor agreement. Thus, the top distributors argue, if the aggrieved distributors intend to prove at trial that the Circle of Success events do not help the attendees learn how to succeed as Herbalife distributors, then they will need to go into the details of a distributor's obligations. However, it is not enough that the alleged misconduct is somehow connected to the obligations of the underlying agreements; the misconduct must "be *founded in* or *inextricably bound up with*" such obligations. *Id.* at 553 (emphasis added). Here, as in *Goldman*, the distributor agreements appear to be "at least one step removed from the actual transactions that generated the [aggrieved distributors'] complaint[], *id.*—namely, the misrepresentations that the top

15

distributors made in coordination with Herbalife to convince the aggrieved distributors to spend money attending the Circle of Success events.

Moreover, in deciding whether equitable estoppel is appropriate, we must remember the purpose of the doctrine, which is to prevent the plaintiff from "hav[ing] it both ways." *Id.* at 543 (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). "[T]he signatory 'cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id.* (quoting *Grigson*, 210 F.3d at 528). Here, there is no duty in the distributor agreements to participate in the Circle of Success enterprise, so the aggrieved distributors are not seeking to hold the top distributors liable pursuant to any duties imposed by the agreements. Thus, nothing about the aggrieved distributors' suit against the top distributors would give the district court a reason to apply equitable estoppel.

Accordingly, we conclude that the district court correctly declined to apply equitable estoppel to compel arbitration of the aggrieved distributors' claims against the top distributors.[7]

---

[7] In a footnote in their opening brief, the top distributors state that whether the district court erred in declining to apply equitable estoppel is a question of arbitrability that should have been resolved by an arbitrator, not the district court. They cite a decision from the Fifth Circuit, *Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, 866 F.3d 709 (5th Cir. 2017), but they make no attempt to persuade us why that decision was correct. They briefly mention the issue once more in

16

III

Do we have jurisdiction to review the district court's denial of the motion to transfer venue?

No party disputes that the denial of a motion to transfer venue is normally a non-appealable order. Nevertheless, the top distributors argue that we have pendent appellate jurisdiction to review the decision. "Pendent appellate jurisdiction is present when a nonappealable decision is 'inextricably intertwined' with the appealable decision or when 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009) (alteration in original) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995)). It "should be present only under rare circumstances," *id.*, and it does "not exist when resolution of the nonappealable issue [is] not necessary to resolve the appealable one," *id.* at 1380.

the main text of their opening brief, where they list equitable estoppel as one of the threshold issues of arbitrability that was delegated to an arbitrator, but they provide no further argument. Normally, we do not review arguments that were raised only in a footnote without supporting argument. *Asociacion de Empleados del Area Canalera v. Pan. Canal Comm'n*, 453 F.3d 1309, 1316 n.7 (11th Cir. 2006). The top distributors claim that they did not waive this argument because the delegation of equitable estoppel is not a standalone issue; rather, it is a nuanced point in their broader argument that all questions of arbitrability—including equitable estoppel—should have been resolved by an arbitrator. However, as a conceptual matter, we are not persuaded that one argument can be embedded within the other. Threshold questions of arbitrability can be delegated to an arbitrator by contract. *See First Options*, 514 U.S. at 943. But how does one go about delegating the question of equitable estoppel? By definition, there is no contract, which is, after all, why one of the parties is demanding equitable estoppel. So, if there is no contract, how can the issue of equitable estoppel be delegated in the first place? Other than a footnote citation to an out-of-circuit opinion, the top distributors make no attempt in their opening brief to explain to us how such a delegation is possible. Accordingly, we conclude that they waived this argument.

17

Here, we need not resolve the denial of the motion to transfer venue in order to resolve the denial of the motion to compel arbitration. Indeed, resolving the transfer-of-venue issue would require us to consider factors not relevant to our resolution of the arbitration issue, including "the convenience of parties and witnesses." 28 U.S.C. § 1404(a). We are not convinced that this is one of those rare circumstances where pendant appellate jurisdiction can be found. Therefore, we are without jurisdiction to review whether the district court erred in denying the motion to transfer venue.[8]

## IV

The district court's denial of the motion to compel arbitration is **AFFIRMED**. The appeal from the denial of the motion to transfer venue is **DISMISSED**.

---

[8] On April 18, 2019, the top distributors filed a Request for Judicial Notice in which they asked us to take note of discovery and subpoena requests they received in their California and Florida proceedings. The purpose of this motion is to show that the top distributors are subject to duplicative discovery efforts, which might support their argument that the district court erred by denying the motion to transfer venue. However, because we lack jurisdiction to review that issue, we see no reason to grant the motion. Accordingly, the Request for Judicial Notice is **DENIED**.