# United States Court of Appeals
## For the First Circuit

No. 21-1542

GREEN ENTERPRISES, LLC,

Plaintiff, Appellant,

v.

HISCOX SYNDICATES LIMITED AT LLOYD'S OF LONDON; XL CATLIN
LLOYD'S SYNDICATE 2003; AMLIN LLOYD'S SYNDICATE 2001; CANOPIUS
LLOYD'S SYNDICATE 4444; NOA LLOYD'S SYNDICATE 3902; BLENHEIM
LLOYD'S SYNDICATE 5886; BRIT LLOYD'S SYNDICATE 2987/2988,

Defendants, Appellees,

DUAL CORPORATE RISKS LIMITED; CORRIE BAUCKHAM BATTS LIMITED;
LIMEBRIDGE, LLC; WILFREDO FIGUEROA NAZARIO;
INSURANCE COMPANIES A, B, C, D,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Kayatta, Howard, and Gelpí,
Circuit Judges.

José A. Andreu-Collazo, with whom José A. Andréu-Fuentes,
José J. Lamas-Rivera, José R. Olmo-Rodríguez, and Andreu & Sagardia
were on brief, for appellant.
Gregory L. Mast, with whom Paul L. Fields, Jr., Taryn M.
Kadar, Fields Howell LLP, Fernando Sabater-Clavel, Luis J. Clas
Wiscovitch, and Saldaña, Carvajal & Vélez-Rivé, P.S.C. were on

brief, for appellees.

_____

May 19, 2023

_____

**KAYATTA**, **Circuit Judge**.  Green Enterprises, LLC ("Green"), a Puerto Rican recycling company, filed an insurance claim after a fire destroyed one of its plants.  The underwriters of Green's insurance policy, all syndicates at Lloyd's of London ("Underwriters"), denied the claim, prompting Green to initiate this lawsuit.  Pointing to an arbitration clause in the insurance policy,[1] the district court declined to decide the parties' coverage dispute and granted Underwriters' motion to compel arbitration.  Green then timely filed this appeal.

As we will explain, this appeal presents a question of first impression in this circuit that turns on the interactions among Puerto Rico law, two federal statutes, and a multilateral

---

[1]  The arbitration clause provides:

> If the Insured and the Underwriters fail to agree in whole or in part regarding any aspect of this Policy, each party shall, within ten (10) days after the demand in writing by either party, appoint a competent and disinterested arbitrator and the two chosen shall before commencing the arbitration select a competent and disinterested umpire.  The arbitrators together shall determine such matters in which the Insured and the Underwriters shall so fail to agree and shall make an award thereon, and if they fail to agree, they will submit their differences to the umpire and the award in writing of any two, duly verified, shall determine the same.
>
> The Parties to such arbitration shall pay the arbitrators respectively appointed by them and bear equally the expenses of the arbitration and the charges of the umpire.

- 3 -

treaty to which the United States is a party. For the following reasons, we affirm the judgment of the district court granting Underwriters' motion to compel arbitration and dismissing Green's claims without prejudice.

## I.

We "review de novo an order compelling arbitration where" -- as here -- "the appeal involves solely legal issues as to the enforceability of an arbitration clause." Pelletier v. Yellow Transp., Inc., 549 F.3d 578, 580 (1st Cir. 2008).

Our analysis begins with the McCarran-Ferguson Act, Pub. L. No. 79-15, 59 Stat. 33 (1945) (codified at 15 U.S.C. §§ 1011-1015). Generally, a federal statute preempts any state law with which the federal statute directly conflicts. See PLIVA, Inc. v. Mensing, 564 U.S. 604, 617-18 (2011). The McCarran-Ferguson Act largely flips this general rule on its head as applied to conflicts between state laws regulating insurance and most acts of Congress. It states: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

The parties assume (and therefore so shall we) that Article 11.190 of the Puerto Rico Insurance Code, P.R. Laws Ann. tit. 26, § 1119, is the type of state law favored by the McCarran-

Ferguson Act; that is, it is a state[2] law enacted for the purpose of regulating the business of insurance. It prohibits and declares void any agreement that "[d]epriv[es] the insured of right of access to the courts for determination of his rights under [an insurance] policy in event of dispute." Id. In this manner, it renders unenforceable any provision in an insurance policy that would channel the resolution of a coverage dispute to a forum other than the courts. See Berrocales v. Tribunal Superior, 2 P.R. Offic. Trans. 281, 284 (1974).

In so providing, P.R. Article 11.190 directly conflicts with the command in Chapter II of the Federal Arbitration Act (FAA) that courts enforce arbitration agreements between U.S. citizens and non-citizens. 9 U.S.C. §§ 201, 202, 206. Chapter II of the FAA is an act of Congress of general applicability that does not specifically relate to the business of insurance. See Convention Act, Pub. L. No. 91-368, 84 Stat. 692 (1970). So if the McCarran-Ferguson Act applied, we would construe Chapter II of the FAA so as not to supersede a state insurance law such as P.R. Article 11.190. See Humana Inc. v. Forsyth, 525 U.S. 299, 306-07 (1999). As a result, P.R. Article 11.190 -- which voids any provision in an insurance policy that deprives the insured of

---

[2] The McCarran-Ferguson Act specifically defines "State" to include Puerto Rico. 15 U.S.C. § 1015.

access to the courts -- would reverse-preempt the FAA's general mandate to enforce arbitration agreements.

Given the foregoing, Underwriters do not rely on Chapter II of the FAA to sustain an order referring this coverage dispute to arbitration. Instead, Underwriters seek to rely on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "Convention") -- the multilateral treaty that Chapter II of the FAA "implement[s]." See GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. 1637, 1644 (2020); 9 U.S.C. § 201 ("[The Convention] shall be enforced in United States courts in accordance with this chapter."). Article II(3) of the Convention provides:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

The United States acceded to the Convention in September 1970, and Chapter II of the FAA became effective once the Convention entered into force for the United States later that same year. See Convention Act § 4; Convention, 21 U.S.T. 2517. The parties agree that Green's arbitration agreement -- within a commercial insurance policy issued by foreign underwriters to a

domestic United States insured -- is the type of agreement addressed by the Convention.

The parties also agree that because the Convention is a treaty rather than an "Act of Congress," it is not subject to the limiting construction favoring state insurance law to which any such act is subject by virtue of the McCarran-Ferguson Act. Their principal dispute on appeal trains instead on whether and to what extent the Convention is "self-executing"; that is, is directly enforceable as domestic law, "without the aid of any legislative provision," so as to preempt the application of P.R. Article 11.190 in this lawsuit.[3] Medellín v. Texas, 552 U.S. 491, 505 (2008) (quoting Foster v. Neilson, 27 U.S. 253, 254 (1829), overruled on other grounds by United States v. Percheman, 32 U.S. 51 (1833)). To that issue, we devote the next section of this opinion.

## II.

## A.

The Supreme Court "has long recognized the distinction between [self-executing] treaties that automatically have effect as domestic law, and [non-self-executing treaties] that -- while they constitute international law commitments -- do not by

---

[3] Underwriters also assert that, even if the Convention were non-self-executing, they would prevail because the McCarran-Ferguson Act does not apply to legislatively implemented treaties. As described below, we need not address that argument to decide this case.

themselves function as binding federal law." Medellín, 552 U.S. at 504. "[A] treaty is 'equivalent to an act of the legislature,' and hence self-executing, when it 'operates of itself without the aid of any legislative provision.'" Id. at 505 (quoting Foster, 27 U.S. at 254). "When, in contrast, '[treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect.'" Id. (alteration in original) (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888)).

In Medellín, the Supreme Court held that Article 94 of the United Nations Charter did not give decisions of the International Court of Justice immediate domestic legal effect. Id. at 508-09. The Court's "interpretation of [the] treaty, like the interpretation of a statute, beg[an] with its text." Id. at 506. Article 94 provides, "Each Member of the United Nations undertakes to comply with the decision of the International Court of Justice in any case to which it is a party." U.N. Charter art. 94, ¶ 1. The Court, focusing on the text, concluded that Article 94 was not self-executing because it "is not a directive to domestic courts" and "does not provide that the United States 'shall' or 'must' comply with an ICJ decision, nor indicate that the Senate that ratified the U.N. Charter intended to vest ICJ decisions with immediate legal effect in domestic courts." Medellín, 552 U.S. at 508. "Instead," the Court explained, "[t]he words of Article 94 . . . call upon governments to take certain

- 8 -

action," and "the U.N. Charter reads like 'a compact between independent nations' that 'depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.'"  Id. at 508-09 (alterations in original) (first quoting Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 938 (D.C. Cir. 1988); then quoting Edye v. Robertson, 112 U.S. 580, 598 (1884)).  A non-self-executing treaty provision, like Article 94, "addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court."  Id. at 516 (quoting Foster, 27 U.S. at 314); see also Bond v. United States, 572 U.S. 844, 856 (2014) (applying Medellín to hold as non-self-executing the Chemical Weapons Convention, which "provides that '[e]ach State Party shall, in accordance with its constitutional processes, adopt the necessary measures to implement its obligations under this Convention'" (alteration in original) (quoting Chemical Weapons Convention art. VII(1), Jan. 13, 1993, S. Treaty Doc. No. 103-21, 1974 U.N.T.S. 317)).

In contrast, the text of the Convention makes plain that Article II(3) provides a clear "directive to domestic courts." Medellín, 552 U.S. at 508.  Article II(3) by its express terms directly commands courts to channel arbitrable disputes to arbitration:  "The court . . . shall . . . refer the parties to arbitration . . . ."  As the Ninth Circuit described, "This

provision is addressed directly to domestic courts, mandates that domestic courts 'shall' enforce arbitration agreements, and 'leaves no discretion to the political branches of the federal government whether to make enforceable the agreement-enforcing rule it prescribes.'" CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC, 8 F.4th 1007, 1013 (9th Cir. 2021) (quoting Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London, 587 F.3d 714, 735 (5th Cir. 2009) (en banc) (Clement, J., concurring)), cert. denied, 142 S. Ct. 862 (2022). Based on this characterization, that court then concluded, "A straightforward application of the textual analysis outlined in Medellín compels the conclusion that Article II, Section 3 is self-executing . . . ." Id.

The Second Circuit reached the opposite conclusion in Stephens v. American International Insurance Co., 66 F.3d 41, 45 (2d Cir. 1995). But Stephens predated Medellín, offered no analysis of the text of Article II(3), and contained little explanation for why it concluded that the Convention was in relevant part non-self-executing.[4] By contrast, and with the

---

[4] Presented with the same question, the Fourth and Fifth Circuits declined to answer whether Article II(3) is self-executing. Those courts instead concluded that, even assuming Article II(3) is non-self-executing, the McCarran-Ferguson Act does not apply to Chapter II of the FAA. See ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 388 (4th Cir. 2012); Safety Nat'l Cas. Corp., 587 F.3d at 731.

benefit of <u>Medellín</u>, we find that the text of Article II(3) manifests precisely the type of directive to United States courts that is a hallmark of a self-executing treaty provision.

**B.**

Green offers no developed rebuttal to the foregoing conclusion that the text of Article II(3), if read by itself, plainly constitutes a command to domestic courts. Green argues, instead, that we need to widen the scope of our textual inquiry to consider the fact that other sections of the Convention contain no such command and are non-self-executing.[5] Green reasons that because these other sections in the same treaty address the arbitration of disputes in one manner or another, and are non-self-executing, we should conclude that Article II(3) is also non-self-executing notwithstanding its clear direction to courts to refer disputes to arbitration. Green points to four such sections.

First, Article I(3), which gives contracting nations[6] discretion to limit the treaty's application to commercial relationships:

> [Any Contracting State] may . . . declare that it will apply the Convention only to differences arising out of legal

---

[5] Underwriters do not dispute that the other provisions to which Green points are non-self-executing, and we assume the same without deciding that matter.

[6] We use the term "contracting nation," rather than "contracting state" as used in the Convention, to avoid any confusion with state law given the subject of this opinion.

- 11 -

relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

Second, Article II(1), which requires contracting nations -- rather than courts -- to recognize arbitral agreements:

Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

Third, Article III, which requires contracting nations -- again, rather than courts themselves -- to recognize and enforce arbitral awards:

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles.

Finally, Article V(2), which gives contracting nations discretion to refuse enforcement of arbitral awards in certain circumstance:

Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that: (a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or (b) The recognition or enforcement of the award would be contrary to the public policy of that country.

- 12 -

To begin, we reject Green's "all or nothing" argument that the inclusion of these non-self-executing provisions necessarily renders the entire Convention non-self-executing. Although Green is correct that "there is no controlling precedent" on this question, we see no reason why the United States could not enter into a treaty that commands court action on one matter while leaving it to Congress to legislate such a command on a related subject matter. We thus join the Ninth and Fifth Circuits in concluding that a treaty can have both self-executing and non-self-executing provisions. Lidas, Inc. v. United States, 238 F.3d 1076, 1080 (9th Cir. 2001) ("[I]t is far from uncommon for a treaty to contain both self-executing and non-self-executing provisions."); United States v. Postal, 589 F.2d 862, 884 n.35 (5th Cir. 1979) ("A treaty need not be wholly self-executing or wholly executory. Therefore, a self-executing interpretation of article 22 [of the High Seas Convention] would not necessarily call for a similar interpretation of article 6." (citation omitted)); see also Restatement (Fourth) of Foreign Relations Law of the United States § 310 cmt. b (Am. L. Inst. 2018) ("Courts often speak to whether a treaty as a whole is self-executing, but the inquiry is best understood as requiring an assessment of whether the particular treaty provision at issue is self-executing.").

- 13 -

Of course, this holding does not foreclose Green's claim; the fact that a treaty can have both self-executing and non-self-executing provisions does not by itself compel the conclusion that Article II(3), specifically, is self-executing. Green therefore separately argues that even if Article II(3) appears from its text to be self-executing, it simply cannot function on a standalone basis without the sections that are non-self-executing, and thus Article II(3) itself cannot be considered self-executing.

As to Articles I(3) and V(2), we see no reason why Article II(3)'s command to courts could not stand by itself without legislation implementing those other two articles. Each simply grants contracting nations the option of limiting the scope of enforcement of arbitral agreements and awards. Courts of a contracting nation need not hold off on enforcing Article II(3) until the political branch has affirmatively decided whether or not to enact such limitations; a court asked to refer a dispute to arbitration must only determine whether any relevant limitations have yet been enacted.

Similarly, we see no reason why the assumed non-self-executing status of Article II(1) must carry over to Article II(3). Green points to the fact that Article II(3) does not directly define which "agreements" are judicially enforceable under that provision, instead referring to "agreement[s] within

the meaning of this article."  The relevant definition appears in Article II(1), which requires contracting nations to "recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."  Green, in turn, asserts that Article II(1) left it to the contracting nations to determine which "subject matter [is] capable of settlement by arbitration" for purposes of the Convention, and thus, without implementing legislation, courts cannot know which "agreements" should be enforced.[7]  But courts tasked with enforcing Article II(3) can simply look to the plain text of Article II(1) to understand what types of agreements fall "within the meaning of this article" -- and that remains true regardless of whether any legislation has been enacted to "recognize" such agreements.

---

[7] Green does not argue that insurance disputes generally constitute a subject that is not "capable of settlement by arbitration" under the Convention, and any such argument would be meritless.  See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 639 n.21 (1985) ("Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention.  But we decline to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so.").

Green also cites the Supreme Court's statement in GE Energy that the "Convention was drafted against the backdrop of domestic law," and "the provisions of Article II contemplate the use of domestic doctrines to fill gaps in the Convention." 140 S. Ct. at 1645. The Court specifically lists Article II(1) as an example of such a gap, explaining that that provision "does not identify what disputes are [capable of settlement by arbitration], leaving that matter to domestic law." Id. Green reads this to mean that implementing legislation affirmatively defining which matters are "capable of settlement by arbitration" for purposes of the Convention is necessary to "fill the gap[]." See id.

Green's conclusion, however, rests on the assumption that the "domestic law" the Court references includes only legislation enacted with the purpose of implementing the Convention. That assumption is plainly incompatible with the Court's statement, in the course of the same analysis, that the "Convention was drafted against the backdrop of domestic law." Id. (emphasis added). The "domestic law" that defines which matters are "capable of settlement by arbitration" includes the body of law regarding arbitrability predating accession to the Convention -- namely Chapter I of the FAA, 9 U.S.C. §§ 1-16, and the case law interpreting it. Chapter I, which was enacted in 1925, provides that commercial arbitration agreements are generally enforceable, with a few exceptions not relevant here.

- 16 -

See Fraga v. Premium Retail Servs., Inc., 61 F.4th 228, 233 (1st Cir. 2023). Accordingly, even in the absence of any specific implementing legislation, Article II(3) could have still operated immediately upon the Convention's entry into force. Courts tasked with its enforcement would simply look to existing doctrines for guidance in determining which matters are arbitrable in the international context -- just as a court enforcing the self-executing extradition treaty at issue in United States v. Rauscher, 119 U.S. 407 (1886), discussed further below, would have relied upon existing definitions of certain crimes that served as grounds for extradition but were left undefined by the treaty. See id. at 410-11, 417-19.

That courts might need to look to previously enacted legislation (and the case law interpreting it) when carrying out a treaty's terms does not render a treaty non-self-executing, and Green does not argue otherwise. This conclusion may appear, at first, to sit in tension with the Supreme Court's holding in Medellín that a treaty is self-executing "when it 'operates of itself without the aid of any legislative provision.'" Medellín, 552 U.S. at 505 (quoting Foster, 27 U.S. at 254); see also id. at 505-06 ("Only '[i]f the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, [will] they have the force and effect of a legislative

- 17 -

enactment.'" (alterations in original) (quoting Whitney, 124 U.S. at 194)).

However, the "legislative provision" the Court mentioned there most clearly refers to implementing legislation intended to give substantive meaning and domestic force to a treaty's terms, not -- as is relevant here -- existing legislation, enacted entirely independently from the treaty's negotiation or accession process, that establishes the general background principles against which a treaty is drafted. In Medellín, the Court held that Article 94 of the U.N. Charter is non-self-executing in part because it is "a commitment on the part of U.N. members to take future action through their political branches." See id. at 508 (emphasis added) (quoting Brief for the United States as Amicus Curiae at 34, Medellín v. Dretke, 544 U.S. 660 (2005) (No. 04-5928), 2010 WL 3375626). Similarly, in Foster -- the case from which Medellín quoted the "aid of any legislative provision" passage -- the Court characterized non-self-executing treaties as "pledg[ing] the faith of the United States to pass acts which shall ratify and confirm [the treaty's terms]." 27 U.S. at 314. In contrast, when "the Executive determines that a treaty should have domestic effect of its own force, that determination may be implemented . . . by ensuring that it contains language plainly providing for domestic enforceability." Medellín, 552 U.S. at 526; cf. id. at 508 ("[Article 94 does not] indicate that the

- 18 -

Senate that ratified the U.N. Charter intended to vest ICJ decisions with immediate legal effect in domestic courts."). The question whether a treaty provision can operate "without the aid of any legislative provision" thus focuses on whether the provision constitutes a call for political action or instead is intended for immediate and direct judicial application. And as discussed, Article II(3) falls into the latter category: It is simply a command to courts to enforce certain arbitration agreements, using principles already established through pre-existing legislation and case law.[8]

This understanding of Article II(3) is consistent with Asakura v. City of Seattle, 265 U.S. 332 (1924), and United States v. Rauscher, 119 U.S. 407 (1886). In each case, the Court held that a treaty provision was self-executing even though the parties to the treaty retained certain political discretion and courts tasked with enforcing the treaty were required to look to domestic law. In Asakura, a United States-Japan "friendly relations" treaty provided that the citizens of each country "shall have liberty to enter, travel and reside in the territories of the other to carry on trade . . . and generally to do anything incident to or

---

[8] Of course, we do not suggest that courts enforcing Article II(3) should not also look to legislation enacted during or at any time after the accession process when answering questions of arbitrability -- we merely conclude that such legislation was not necessary for enforcement of Article II(3) at the time the Convention entered into force for the United States.

- 19 -

necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established." 265 U.S. at 340 (quoting Treaty of Commerce and Navigation, Japan-U.S., art. I, Apr. 5, 1911, 37 Stat. 1504). Although the substantive "terms" of carrying on trade in each country were clearly within each country's discretion and integral to the resolution of any alleged treaty violation, the provision calling for the equal enforcement of those terms was nonetheless self-executing. See id. at 341.

In Rauscher, a United States-Great Britain extradition treaty provided for the extradition from one country of someone charged in the other country with any of seven listed crimes (e.g., murder or robbery), but only if "such evidence of criminality as, according to the laws of the place where the fugitive . . . [was] found, would justify his apprehension and commitment for trial if the crime" had been committed in that place. 119 U.S. at 411 (quoting Treaty of Aug. 9, 1842, Gr. Brit.-U.S., art. X, 8 Stat. 572). "[T]he laws of the place where the fugitive . . . [was] found" were plainly within the discretion of the political and legal bodies of each country, and courts tasked with enforcing the treaty would need to look to such laws, but this did not cause the Court to hesitate in concluding that the treaty was self-executing. See id. at 417–19. Here too, many questions of arbitrability are left to the contracting nations, see GE Energy, 140 S. Ct. at 1645,

but Article II(3)'s command to courts to enforce an arbitration agreement is self-executing.[9]

The issue is closer with Article III, which calls for the recognition and enforcement of arbitral awards. Recall that Article II(3) commands only that courts refer covered disputes to arbitration; i.e., it effectively eliminates access to courts for the resolution of arbitrable disputes as long as at least one party insists on adhering to the parties' agreement to arbitrate. But Article II(3) is silent as to decisions and awards made by arbitrators, the enforcement of which is the primary focus of the rest of the Convention's substantive provisions, including Article III. See GE Energy, 140 S. Ct. at 1644. This brings us to the final thrust of Green's purely textual argument -- contending that Article II(3) (commanding courts to refer disputes to arbitration) and Article III (commanding contracting nations to enforce the awards that emerge as a result of the referrals) are "symbiotically interdependent." Hence, reasons Green, because

_____

[9] We distinguish this situation from one in which a hypothetical treaty provided the following: Article I -- "The contracting nations shall each establish a new code for regulating the enforcement of international arbitration agreements"; and Article II -- "The courts of each contracting nation shall apply the code adopted pursuant to Article I to the citizens of each contracting nation on the same terms." In that scenario, courts enforcing Article II would have no code to apply until the "political department" took action in compliance with Article I.

- 21 -

Article III by its terms does not appear to be self-executing, neither can Article II(3).

We see several fatal flaws in this argument. To begin, the notion that the two articles are interdependent, thus as goes one so goes the other, does not itself tell us which way to go. As discussed, Article II(3) gives its command directly to courts, while Article III is addressed to "[e]ach Contracting State." But a command that a contracting nation "recognize" and "enforce" arbitration decisions could be seen, in substance, as a directive to a nation's courts. Cf. Medellín, 552 U.S. at 508 (explaining that the treaty "does not provide that the United States 'shall' . . . comply with an ICJ decision"). So if the two articles must share a single classification, it is hardly clear that non-self-executing would be the correct choice. More fundamentally, even assuming that Article III is non-self-executing (an issue we do not decide), that does not compel us to conclude that Article II(3) cannot stand on its own. As the Supreme Court observed in Medellín, "submitting to jurisdiction and agreeing to be bound are two different things." 552 U.S. at 507. The same is true for referring a dispute to arbitration and enforcing the award that results from that arbitration. Hence, doubt about whether a nation's commitment to enforce arbitral awards is self-executing provides an insufficient reason to deem non-self-executing a treaty's express command to the nation's

- 22 -

courts to refer covered disputes to arbitration. And for that reason, Green's well-supported insistence that our textual analysis of the Convention need consider the Convention as a whole does not get Green where it needs to go in order to secure a reversal of the district court's order referring this dispute to arbitration.

We certainly acknowledge the difficulties that could arise if a court granted a motion to compel arbitration but was then unable to enforce the resulting award. But we need not speculate how -- in a hypothetical world without any implementing legislation -- a dispute over an arbitral award would be resolved if the losing party refused to comply with the arbitrator's decision. We do not have before us the enforcement of an award, but rather a motion to compel arbitration. More importantly, in the real world, section 207 of the FAA instructs federal courts to confirm "arbitral award[s] falling under the Convention." 9 U.S.C § 207.[10] And Green does not argue that Puerto Rico insurance law

_____

[10] While the Puerto Rico Commercial International Arbitration Act allows courts to refuse enforcement of arbitral awards if "[t]he subject matter of the dispute is not capable of settlement by arbitration under the laws of Puerto Rico," P.R. Laws Ann. tit. 32, § 3249a(1)(b)(i), that act does not specifically regulate "the business of insurance," and thus would not reverse-preempt the FAA under the McCarran-Ferguson Act in the event of any alleged conflict. Additionally, the two limitations on enforcement contained within Article V(2) of the Convention, as implemented through section 207 of the FAA, would not operate to block enforcement of an award here. First, as described supra in note 7, insurance disputes are generally capable of settlement by

- 23 -

conflicts with that section, nor could Green so argue. "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy . . . , the McCarran-Ferguson Act does not preclude its application." Humana Inc., 525 U.S. at 310. Here, Article II(3) of the Convention directly conflicts with and preempts P.R. Article 11.190's proscription of insurance policy clauses that "[d]epriv[e] the insured of right of access to the courts." After the parties have been directed to arbitration pursuant to Article II(3), P.R. Article 11.190 simply has no application; its text cannot be read to conflict with the FAA's call to enforce an award after the parties have already gone through arbitration. Indeed, such a reading would be contrary to the interests of insureds seeking coverage who are precluded by the Convention from litigating their claims in courts in the first insistence.

## C.

Green turns next to the Convention's ratification history and the associated enactment of Chapter II of the FAA to support its reading of Article II(3). See Medellín, 552 U.S. at 507 ("Because a treaty ratified by the United States is 'an

---

arbitration. Second, public policy favors enforcement here. See Mitsubishi Motors Corp., 473 U.S. at 631 ("[T]he emphatic federal policy in favor of arbitral dispute resolution . . . applies with special force in the field of international commerce.").

agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." (quoting Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226 (1996))). In 1968, when President Lyndon B. Johnson submitted the Convention to the Senate for approval, he explained in the letter of transmittal that "[c]hanges in title 9 (arbitration) of the United States Code will be required before the United States becomes a party to the convention. The United States instrument of accession to the convention will be executed only after the necessary legislation is enacted." 114 Cong. Rec. 10488 (1968). A Senate report regarding the Convention made the same statement. See S. Exec. Rep. No. 90-10, at 2 (1968) ("Changes in the Federal Arbitration Act . . . will be required before the United States becomes party to the convention.").

Green argues that deferring accession until after the enactment of "the necessary legislation" is proof that the Convention would have no domestic legal effect absent legislation. But one can just as easily view the deferral of accession as evidence that the President viewed Article II(3) as self-executing -- and thus making it prudent to have legislation in place that would become operative once a treaty that contained such a command to United States courts entered into force. See Convention Act § 4. Simply put, if, as the text strongly suggests,

- 25 -

the command to courts to refer cases to arbitration is self-executing, one can easily see why the President and Congress might have first wanted to attend to the details of how parties should go about requesting such referral and what would follow when a referral to arbitration was made. Supporting this reading is the fact that most of Chapter II's provisions "address procedural and logistical matters, such as federal courts' jurisdiction to hear claims arising under the Convention and the proper venue for such claims." CLMS Mgmt., 8 F.4th at 1014. Ambassador Richard D. Kearney, a legal advisor for the State Department, testified before the Senate Foreign Relations Committee that "[w]e will not submit the U.S. ratification of the convention until this legislation establishing adequate procedures has been approved by the Congress," S. Exec. Rep. No. 90-10, at 6 (emphasis added), further indicating that the Executive viewed legislation as attending to logistical details rather than as a requirement for the Convention's substantive legal force. See also id. at 5-6 ("The Department of Justice . . . has suggested that implementing legislation . . . is desirable . . . to insure the coverage of the [FAA] extends to all cases arising under the treaty and . . . to take care of related venue and jurisdictional requirement problems.").

Furthermore, even if Congress and the Executive believed that the enactment of Chapter II was necessary to give the

Convention domestic force, such belief could simply have been attributable to those provisions that we have assumed, for purposes of this opinion, are non-self-executing. As described above, the need for legislation to make those provisions operative would not render Article II(3) non-self-executing.

Green additionally points to Senate testimony by Ambassador Kearney regarding the impact of accession on state law: "[O]ur purpose in adhering to the Convention is for the beneficial effects it will produce for the foreign commerce of the United States and not to make any changes with respect to matters that are traditionally within the jurisdiction of the 50 states of the Union." S. Rep. No. 91-702, at 6 (1970). From this statement, Green concludes that the Executive understood the Convention to be non-self-executing because, if it were self-executing, it would have altered state law regarding arbitration of insurance disputes. But Green takes the statement out of its necessary context. Ambassador Kearney was explaining the Executive's decision to file a declaration, in accordance with Article I(1), to limit the Convention to commercial legal relationships so that its terms would not apply to matters "traditionally within the jurisdiction" of states, such as "family status." Id. He was not, as is necessary for Green's argument, implicitly declaring that the arbitrability of international insurance disputes was beyond federal jurisdiction and would be unaffected by the

Convention. Ambassador Kearney had earlier described that, even prior to accession to the Convention, "the general subject of arbitration [was] beyond doubt [already] completely within the Federal jurisdiction if it concerns foreign or interstate commerce." S. Exec. Rep. No. 90-10, at 8.

The Executive's more recent statements regarding the Convention's status further undermine Green's argument. The Supreme Court requested the views of the United States when deciding whether to grant a petition for a writ of certiorari in Safety National. Brief for the United States as Amicus Curiae at 1, La. Safety Ass'n of Timbermen -- Self Insurers Fund v. Certain Underwriters at Lloyd's, London, 562 U.S. 827 (2010) (No. 09-945), 2010 WL 3375626. There, the Fifth Circuit had held that the McCarran-Ferguson Act does not apply to the Convention and Chapter II of the FAA, but it did not reach the issue of whether Article II(3) is self-executing. Safety Nat'l, 587 F.3d at 731.

The United States, in an amicus brief opposing the petition for certiorari, asserted that Article II in its entirety is self-executing based on its plain text, specifically addressing both Article II(1) and Article II(3). Brief for the United States at 8-11. The brief further explained that, in the Executive's view, the enactment of Chapter II is not evidence of non-self-execution; rather, such enactment "is consistent with the approach taken in the context of certain tax and extradition treaties that

- 28 -

are self-executing but nevertheless are accompanied by implementing legislation to facilitate their enforcement." Id. at 11.

The Supreme Court described in Medellín that "[i]t is . . . well settled that the United States' interpretation of a treaty 'is entitled to great weight.'" 552 U.S. at 513 (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 185 (1982)). While the Court subsequently noted in GE Energy that it has "never provided a full explanation of the basis for [its] practice of giving weight to the Executive's interpretation of a treaty," the Court nonetheless is yet to "delineate[] the limitations of this practice, if any." 140 S. Ct. at 1647. The government's clear view as expressed in its Safety National amicus brief thus lends further support to our conclusion here.

Finally, Green points to dicta in Medellín regarding the role of Chapter II in implementing the Convention. In holding that Article 94 of the United Nations Charter is non-self-executing and thus judgments of the International Court of Justice are not binding, the Court described:

> Congress is up to the task of implementing non-self-executing treaties, even those involving complex commercial disputes. The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress. See, e.g., 22 U.S.C. § 1650a(a) ("An award of an arbitral tribunal rendered pursuant to chapter IV of the [Convention on the

- 29 -

> Settlement of Investment Disputes] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States"); 9 U.S.C. §§ 201–208 ("The [U.N.] Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter," § 201). Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result.

Medellín, 552 U.S. at 521–22 (alterations in original) (citation omitted). Green urges us to read this passage to mean that the Convention in its entirety is non-self-executing. The Court, however, cites Chapter II specifically in support of the "different status" of "[t]he judgments of . . . international tribunals." Id. at 521 (emphasis added). And, as the Court noted in GE Energy, Article II stands out for addressing arbitration agreements, unlike the rest of the Convention which "focuses almost entirely on arbitral awards." 140 S. Ct. at 1644 (emphasis added). So the Court's reference to Chapter II in Medellín can, at most, be read to support the non-self-executing status of the Convention's provisions that pertain to the enforcement of arbitral awards, such as Article III. And we have already assumed, for purposes of this opinion, that those provisions are non-self-executing. See Safety Nat'l, 587 F.3d at 736 (Clement, J.,

- 30 -

concurring) ("The Court's dictum cited [Chapter II of the FAA] as an exemplar of Congress's ability to accord 'domestic effect' to the judgments of similar international tribunals. . . .  It was therefore Article III, and not Article II, that the Medellín Court was addressing.").

In sum, none of Green's arguments can overcome the self-executing nature of the plain text of Article II(3).  That article, which is not an act of Congress, has the force of law and applies directly to preempt Puerto Rico law.  We need not address whether Puerto Rico insurance law would reverse-preempt Chapter II of the FAA were Article II(3) non-self-executing.

## III.

As an alternative argument, Green posits that, assuming Article II(3) is self-executing, the arbitration agreement here is "incapable of being performed" under Article II(3)'s own terms. Article II(3) allows a court to refuse enforcement of an arbitration agreement if "it finds that the said agreement is null and void, inoperative or incapable of being performed." Separately, Article V(2)(b) allows contracting nations to refuse enforcement of an arbitral award if such enforcement "would be contrary to the public policy of that country."  Putting these provisions together, Green argues that if enforcing an arbitration agreement would give rise to an award unenforceable under

- 31 -

Article V(2)(b), then the arbitration agreement itself should be deemed "incapable of being performed" under Article II(3).

Green asserts that the instant agreement falls into this category because it would "contravene [the] public policy" -- codified in the McCarran-Ferguson Act -- of leaving insurance regulation to the states. This policy-based argument runs headlong into Ledee v. Ceramiche Ragno, 684 F.2d 184 (1st Cir. 1982), in which we held that the "null and void" clause of Article II(3) "must be interpreted to encompass only those situations -- such as fraud, mistake, duress, and waiver -- that can be applied neutrally on an international scale." Id. at 187. However, in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985), the Supreme Court noted that "public policy" could serve as the basis for "condemning" an arbitration agreement covered by the Convention, although it was not specifically addressing the "null and void" clause. Id. at 637 n.19.

We need not decide whether Mitsubishi abrogated our holding in Ledee, as Green's argument fails even if a court could deem an arbitration agreement "incapable of being performed" on policy grounds.[11]  The McCarran-Ferguson Act calls for reverse-

_____

[11] Green separately argues that such policy discretion indicates that Article II(3) is non-self-executing. But, as discussed above, limited discretion over Article II(3)'s application does not render that provision non-self-executing, as courts can turn to existing doctrines to "fill the gaps." See GE Energy, 140 S. Ct. at 1645 ("Article II(3) states that it does not

preemption only of "Acts of Congress"; any policy preference expressed within it regarding state regulation of insurance does not bear on the relationship between state law and a self-executing treaty provision.  And the policy considerations weigh strongly in favor of enforcement here, as "the emphatic federal policy in favor of arbitral dispute resolution . . . applies with special force in the field of international commerce."  Mitsubishi Motors Corp., 473 U.S. at 631; see also id. at 629 ("[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' [arbitration] agreement, even assuming that a contrary result would be forthcoming in a domestic context.").

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

---

apply to agreements that are 'null and void, inoperative or incapable of being performed,' but it fails to define those terms. Again, the Convention requires courts to rely on domestic law to fill the gaps; it does not set out a comprehensive regime that displaces domestic law.").  Similarly, the Convention does not define the precise procedure by which a party may obtain a court order in compliance with Article II(3), yet that is hardly a reason to view Article II(3) as anything other than a direct command that courts -- using whatever domestic procedures apply -- refer disputes to arbitration.