[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-11211

_____

VARIOUS INSURERS, REINSURERS AND
RETROCESSIONAIRES SUBSCRIBING TO POLICY
NUMBERS 106/IN/230/0/0, 28807G19, B080130181G19
B080131297G19, B080127577G19, B080130231G19,
B080130291G19, B080130328G19, B080128807G19
AND B080130331G19 DBD,
as subrogee of
Shariket Kahraba Hadjret En Nouss,

Plaintiff-Appellant,

*versus*

GENERAL ELECTRIC INTERNATIONAL, INC.,
GENERAL ELECTRIC COMPANY,
GE POWER SERVICES ENGINEERING,
GE POWER,
VARIOUS JOHN DOE CORPORATIONS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-04751-VMC

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

JORDAN, Circuit Judge:

The arbitration dispute in this case arises out of a catastrophic turbine failure at the Hadjret En Nouss Power Plant in Tipaza, Algeria. The main question presented is whether the owner of the Plant and its subrogees are bound by an arbitration clause in a contract between the operator of the Plant and various General Electric entities.

**I**

The Plant is owned by Shariket Kahraba Hadjret En Nouss ("SKH"), which is itself owned jointly by the Algerian government (49%) and Algerian Utilities International Ltd. (51%), a company that SNC-Lavalin Contructeurs International Inc. ("SNC") owns a 51% stake in. SNC operated the Plant on behalf of SKH.

SNC entered into a contract with SKH and multiple contracts with various General Electric entities. SNC and SKH signed an Operation and Maintenance Contract in July of 2006 designating SNC as the sole "Operator" of the Plant and SKH as the sole "Project Owner." Most relevant to this appeal, SNC entered into a Services Contract with General Electric International. SNC also entered into a Supply Contract with General Electric Company, an Installation Contract with General Electric International, and a Coordination Contract with General Electric Company and General Electric International. All of these contracts contained arbitration provisions.

In the wake of a catastrophic turbine failure at the Plant, various insurers, reinsurers, and retrocessionaires (collectively the "Insurers") initiated litigation as subrogees of SKH against General Electric International, General Electric Company, GE Power, and GE Power Services Engineering (collectively the "GE Entities") and various Jane Doe corporations in Georgia's state-wide business court. The GE Entities removed the case to federal court.

Following removal, the GE Entities moved the district court to compel arbitration pursuant to the arbitration provision in the Services Contract and SKH's purported status as a third-party beneficiary of that agreement. The district court granted the motion to compel arbitration, concluding that SKH was a third-party beneficiary of the Services Contract. *See Various Insurers, Reinsurers, and Retrocessionaires v. General Electric Int'l, Inc.*, 662 F. Supp. 3d 1298, 1305–07 (N.D. Ga. 2023).

On appeal, the Insurers do not advance any argument regarding the specific rights of the GE Entities which were not parties to the Services Contract to compel arbitration in the event that arbitration can be compelled. We therefore do not address this issue. *See Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 878 (11th Cir. 2023) ("A party who fails to squarely raise a claim in its brief … abandons that claim."). If the Insurers are required to arbitrate against General Electric International (the only GE Entity party to the Services Contract), so too are they required to arbitrate against the other GE Entities. The questions before us are whether the district court correctly ruled that the Insurers' subrogor, SKH, was

a third-party beneficiary of the Services Contract, and whether the district court correctly left the arbitrability of each claim to the arbitrator.

After consideration of the parties' arguments, and with the benefit of oral argument, we affirm the district court's grant of the GE Entities' motion to compel arbitration because the Insurers—as subrogees of SKH, the Plant's owner—are third-party beneficiaries of the Services Contract. We also affirm the district court's ruling that any questions regarding the ultimate arbitrability of particular claims should be resolved by the arbitrator.

## II

We first address the third-party beneficiary issue with respect to the Services Contract. "We review *de novo* a district court's grant of a motion to dismiss and compel arbitration." *Bodine v. Cook's Pest Control, Inc.*, 830 F.3d 1320, 1324 (11th Cir. 2016).

## A

The parties and the district court agreed that the third-party beneficiary question is governed by federal common law. We proceed under that same assumption without deciding the applicable law. *See Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1087 (11th Cir. 2024) (assuming without deciding that federal common law applied where the parties argued the case under that law); *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) ("If the parties litigate the case under the assumption that a certain law applies, we will assume that that law applies.").

This case is governed by the New York Convention, which Congress has implemented through Chapter 2 of the Federal Arbitration Act. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 4739; 9 U.S.C. §§ 201 *et seq.* A party seeking to enforce an arbitration provision under the Convention may move to compel arbitration "in accordance with the agreement." 9 U.S.C. § 206. *See Suazo v. NCL (Bahamas) Ltd.*, 822 F.3d 543, 546 (11th Cir. 2016).

When evaluating a motion to compel arbitration under the Convention, "a court conducts a very limited inquiry." *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005) (citation and quotation marks omitted). If four prerequisites are met and none of the Convention's affirmative defenses apply, then the "district court must order arbitration[.]" *Id.* The four prerequisites are as follows:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Id.* at 1294 n. 7.

The only prerequisite at issue in this case is the first: whether there exists an agreement to arbitrate. The dispute is not whether the Services Contract contains an arbitration provision—it does—

but whether that provision binds SKH as a third-party beneficiary (and therefore the Insurers, who are SKH's subrogees). *See generally US Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 n.5 (2013) ("'Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against' a third party.") (citation omitted).

**B**

"It is well-established that the parties to a contract may create rights in a third-party beneficiary by manifesting an intention to do so." *Beverly v. Macy*, 702 F.2d 931, 940 (11th Cir. 1983). A "third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of a signatory." *InterGen N.V. v. Grina*, 344 F.3d 134, 146 (1st Cir. 2003).

The "test under federal common law for third-party beneficiary status is whether the contract reflects the express or implied intention of the parties to benefit the third party." *Hencely v. Fluor Corp.*, 120 F.4th 412, 431 (4th Cir. 2024) (citation and internal quotation marks omitted). The Restatement (Second) of Contracts provides this explanation:

> (1) Unless otherwise agreed between the promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of a promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the

circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (A.L.I. 1981). Courts addressing third-party beneficiary status under federal common law have looked to § 302 of the Restatement for guidance. *See Price v. Pierce*, 823 F.2d 1114, 1121 (7th Cir. 1987); *Montana v. United States*, 124 F.3d 1269, 1273–74 (Fed. Cir. 1997); *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 913 (4th Cir. 2013). *See also Beverly*, 702 F.2d at 940 (considering § 302 to determine third-party beneficiary status in a flood insurance dispute governed by federal law).

No one suggests that SKH was an intended beneficiary under § 302(1)(a) of the Restatement. The dispute centers squarely on § 302(1)(b)—whether "the circumstances indicate that" the parties to the Services Contract intended to give SKH "the benefit of the promised performance." Based on the record before us, we conclude that the language of the Services Contract and the circumstances surrounding its formation readily indicate the parties' intention to grant SKH the benefit of the performance promised.

"[T]he key inquiry is whether the claimant was intended to be benefited by the contract provision in question." *Beverly*, 702 F.2d at 940. "One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Montana*, 124 F.3d at 1273 (citing § 302(1)(b) cmt. d). In evaluating the intentions of the parties to a contract, "a court may look beyond the contract to

the circumstances surrounding its formation." *Beverly*, 702 F.2d at 940. *Accord Hencely*, 120 F.4th at 431 ("[I]ntent may be determined by the contract itself, as well as the circumstances surrounding its formation.") (citation and internal quotation marks omitted); Restatement (Second) of Contracts § 302, Reporter's Note to cmt. a ("A court in determining the parties' intentions should consider the circumstances surrounding the transaction as well as the actual language of the contract.").

The Services Contract provides that "the Operator [SNC] is responsible for operating and maintaining [the] power station . . . pursuant to an O&M Agreement entered into with the Project Owner [SKH.]" D.E. 21-3 at 7. It also specifies that the referenced "O&M Agreement" is the Operation and Maintenance Contract between SKH and SNC "concerning the operation and maintenance of the Power Station by the Operator [SNC] in favor of the Project Owner [SKH]." *Id.* at Art. 1.11.

In addition, the Services Contract sets out the circumstances under which the "supply of Parts and the execution of services by the Service Provider" are to be accomplished. *See id.* at Art. 1.57. The very first circumstance concerns "changes to a Power Train Set decided upon by *either* the Project Owner [SKH] or the Operator [SNC]." *Id.* (emphasis added). The Services Contract further states that SKH "may have access to [the] Operation and Maintenance reports" that the "Service Provider [General Electric International] . . . [is] responsible for prepar[ing]." *Id.* at Art. 6.14.

Finally, the Services Contract allows SKH to act unilaterally in certain circumstances. In the event of an emergency that the Service Provider fails to respond to, the Services Contract provides that SKH on its own "may make any decisions without informing the Service Provider beforehand . . . in order to avoid or limit the damages or losses that may be suffered by persons or property." *Id.* at Art. 21.

Based on this collection of direct references and explicit rights, SKH would be "reasonable in relying on the [Services Contract] as manifesting an intention to confer a right on [it]." *Montana*, 124 F.3d at 1273. *Cf. United States v. S. Fla. Water Mgmt. Dist.*, 922 F.2d 704, 711 (11th Cir. 1991) (holding that non-parties were not third-party beneficiaries because they "fail[ed] to point to any specific language in the [ ] contract that confer[red] rights on them").

The Insurers rely primarily on two First Circuit cases to resist this conclusion, but we do not find them applicable.

The Insurers first cite to *InterGen*, 344 F.3d at 146–57. *InterGen*, however, is materially different. In that case the First Circuit evaluated whether a non-party was a third-party beneficiary where the arbitration clauses were exclusive to "controversies, disputes or claims between the Buyer and Seller." *Id*. at 146. The terms "Buyer" and "Seller" were "explicitly defined" and did not include InterGen, the non-party. *See id*. The defendants argued that because InterGen was the parent company of the entities defined as the "Owner" in the contract, it was a third-party beneficiary. *See id*. at 147. But the First Circuit reasoned that "an intimate corporate

relationship, without more, is not tantamount to an assignment of specific rights." *Id*.

Here there is "more." SKH is explicitly referenced throughout the Services Contract as the Owner of the Plant. And, as the Owner, SKH is entitled to unilaterally direct the Service Provider to make changes to the power train sets, to demand access to reports the Service Provider must produce, and to independently act to avoid damages or losses that may result from an emergency. *See* D.E. No. 21-3, Arts. 1.57, 6.14, 21. The repeated references and rights afforded to SKH demonstrate the parties' intent that the Services Contract's performance would benefit SKH, and in some instances, that SKH would enjoy the right to unilaterally direct those benefits or exercise contractual rights.

*InterGen* would be relevant if our conclusion about SKH's third-party beneficiary status were based on SNC's 51% ownership of Algerian Utilities, which in turn owns 51% of SKH. But our conclusion is not based on these corporate relationships.

The Insurers also point to *Hogan v. SPAR Grp., Inc.*, 914 F.3d 34 (1st Cir. 2019). In that case, SPAR—a retail services provider—obtained most of its personnel from SBS, a staffing company. SBS, in turn, hired Hogan as an independent contractor and assigned him to perform certain duties for SPAR. When Hogan sued SBS and SPAR under the Fair Labor Standards Act, SPAR sought to compel arbitration based on an arbitration provision in the contract between Hogan and SBS. *See id.* at 36–37. The First Circuit held that SPAR was not a third-party beneficiary of the Hogan-SBS

contract because (1) it was not named in the contract; (2) its ability as a customer of SBS to convey its "scheduling and assignment requirements" was only a "tenuous grant of a vague benefit;" and (3) the arbitration provision stated that it only covered disputes between the parties. *See id.* at 39–40.

*Hogan*, like *InterGen*, is distinguishable. Rather than having a "tenuous grant of a vague" entitlement to direct scheduling and assignments, SKH was named in the Services Contract and enjoyed the explicit right to unilaterally direct the work that was an essential purpose of the agreement, i.e., changes to the power train sets at the Plant. And, as noted, the Services Contract provided that SKH could act unilaterally in case of an emergency.

Neither *InterGen* nor *Hogan* alter our conclusion that SKH is a third-party beneficiary of the Services Contract. Because "the circumstances indicate that the promisee [General Electric International] intend[ed] to give [SKH] the benefit of the promised performance" of the Services Contract, we affirm the district court's order compelling arbitration.

## III

We now move to the question of who should determine which, if any, of the Insurers' claims are subject to arbitration. Our resolution of this question is greatly informed by our decision in *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005).

In *Terminix* the parties' agreement contained an arbitration clause providing that "arbitration shall be conducted in accordance

with the Commercial Arbitration Rules" of the American Arbitration Association ("AAA"). *See id.* at 1332. We held that this language represented a clear decision by the parties to delegate the issue of arbitrability to the arbitrator. We reached that conclusion by examining Rule 8 of the AAA, which stated that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* We reasoned that, by incorporating the AAA's rules, "the parties clearly and unmistakably agreed that the arbitrator should decide" the ultimate question of arbitrability. *See id.*

Here, the Services Contract incorporates the Conciliation and Arbitration Rules of the International Chamber of Commerce ("ICC"). *See* D.E. 21-3, Art. 25.2 ("[A]ll disputes . . . shall be definitively resolved on the basis of the Conciliation and Arbitration Rules of the International Chamber of Commerce."). Similar to Rule 8 of the AAA in *Terminix*, ICC Article 6(4) provides that "[i]n all cases referred to the Court under Article 6(3), the Court shall decide whether and to what extent the arbitration shall proceed. The arbitration shall proceed if and to the extent that the Court is prima facie satisfied that an arbitration agreement under the Rules may exist." International Chamber of Commerce, Arbitration Rules, Art. 6(4) (January 1, 2021), https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2021-arbitration-rules/#block-accordion-6.

As in *Terminix*, "the parties have agreed that the arbitrator will answer [the arbitrability] question." 432 F.3d at 1332. We therefore affirm the district court's ruling that the arbitrator should decide which, if any, of the Insurers' claims are subject to arbitration under the Services Contract.

## IV

The district court's order compelling arbitration is affirmed.

**AFFIRMED.**