**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10797
_____

BYRON CHEMALY,

*Plaintiff-Appellant*
*Cross-Appellee,*

*versus*

EDDIE LAMPERT,
  individually,
GRANT GOLD,
  individually,
R. OPERATIONS, LTD,
  a foreign entity,
FOUNTAINHEAD MARINE LIMITED,
  a foreign entity,
CAMPER & NICHOLSONS,
  a Florida Corporation, et al.,

*Defendants-Appellees*
*Cross-Appellants,*

XL CATLIN SYNDICATE 2003,

2                    Opinion of the Court                    24-10797

a foreign insurer registered and authorized to
do business in Florida,

*Defendant.*

———————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:23-cv-24257-BB

———————————

Before JORDAN, HULL, and MARCUS, Circuit Judges.

JORDAN, Circuit Judge:

> The wood and a brass doorknob that had become a smear of fire gave him a sense of everything around him: the miles of space filled with sun, between the burning spreads of sky and ocean. It was February, and the yacht lay still, her engines idle, in the Southern Pacific.
>
> —Ayn Rand, The Fountainhead 600–01 (1943)

This case concerns the arbitrability of claims by a seaman who was injured aboard the M/Y Fountainhead, a 288-foot yacht. The yacht sailed under the flag of the Cayman Islands, and its home port was the Island Gardens Marina on Watson Island in Miami, Florida.

**I**

Byron Chemaly worked as a seaman on the M/Y Fountainhead. Captain Grant Gold led the ship's crew. Fountainhead Marine, Ltd. was the record owner of the yacht. R. Operations, Ltd.

was, according to the employment agreement, Mr. Chemaly's employer.

Both R. Operations and Fountainhead Marine were formed under the laws of Cayman Islands. Mr. Chemaly alleges that these two entities are artifices designed to avoid domestic taxes and liability. They generated no income, and Eddie Lampert paid all their operating expenses. As such, Mr. Chemaly alleges that Mr. Lampert was the beneficial owner of the M/Y Fountainhead and the real party in interest to the yacht.

Camper & Nicholsons served as the manager of the yacht; it ensured that the yacht was adequately manned and equipped during its voyages. Finally, XL Catlin Syndicate 2003M was the underwriter and insured the risks associated with the ownership and operation of the M/Y Fountainhead.

**A**

On August 8, 2020, Mr. Lampert and his son enjoyed a day on the M/Y Fountainhead off the coast of Sag Harbor, New York. Mr. Lampert's son explored the waters using a Sea Bob, a high-performance underwater scooter. After Mr. Lampert's son dismounted the Sea Bob, Captain Gold ordered Mr. Chemaly to help him recover the scooter from the water. Captain Gold grabbed one side of the Sea Bob, and Mr. Chemaly lifted the other. As they raised the Sea Bob, Captain Gold dropped his radio and released his hold of the scooter to reach for the radio. The weight of the Sea Bob fully shifted onto Mr. Chemaly, injuring his right shoulder.

4                   Opinion of the Court                   24-10797

After the incident, Mr. Chemaly alleges that he was ordered to forgo pain medication. He was also put on night shifts so that the yacht's guests would not see him in his sling. Mr. Chemaly continued to work, clean, and make repairs after his injury. When the yacht returned to Miami, he received medical treatment. He was then repatriated to South Africa, his home country, without his personal effects.

**B**

Mr. Chemaly brought this suit against Mr. Lampert, Captain Gold, R. Operations, Fountainhead Marine, Camper, and Catlin in Florida state court. He asserted seven claims: (1) a Jones Act negligence claim against R. Operations, Fountainhead Marine, and Mr. Lampert; (2) an unseaworthiness claim against R. Operations, Fountainhead Marine, and Mr. Lampert; (3) a failure to provide maintenance and cure claim against all defendants; (4) a failure to treat claim against all defendants; (5) a negligence claim against Camper, (6) a conversion claim for his personal effects against all defendants; and (7) a breach of insurance contract claim against Camper and Catlin.[1]

---

[1] The Jones Act provides that:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104(a).

According to the governing employment agreement, R. Operations was Mr. Chemaly's employer and the signatory of an arbitration provision included in the agreement. The provision reads, in full, "[s]hould there be any dispute arising out of the Agreement, it shall be submitted for arbitration in the Cayman Islands." D.E. 1-1 at 17.

The defendants, except for Catlin, removed the case to federal court under 9 U.S.C. § 205 because, in their view, the subject matter of Mr. Chemaly's suit related to an arbitration agreement or award falling under the New York Convention. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 4739; 9 U.S.C. §§ 201 *et seq.* The defendants concurrently invoked the district court's admiralty jurisdiction under 28 U.S.C. § 1333.

The defendants, again except for Catlin, then sought to enforce the employment agreement's arbitration provision and send the entire case to arbitration. Mr. Chemaly has since settled all claims against Catlin.

The district court compelled arbitration as to three of Mr. Chemaly's claims: the Jones Act claim, the maintenance and cure

claim, and the failure to treat claim against R. Operations, Fountainhead Marine, and Mr. Lampert. The court remanded the remaining claims to state court.[2]

## II

We review *de novo* a district court's decision to compel arbitration. *See Various Insurers v. Gen. Elec. Int'l, Inc.*, 131 F.4th 1273, 1276 (11th Cir. 2025). "When evaluating a motion to compel arbitration under the Convention, 'a court conducts a very limited inquiry.'" *Id.* at 1277 (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005)). To compel arbitration, a court must conclude that the Convention's four prerequisites, set out below, are satisfied:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Id.* (quoting *Bautista*, 396 F.3d at 1294 n.7).

---

[2] We review only the district court's order compelling arbitration, as we do not have jurisdiction over the portion of the order remanding some of the claims to state court. *See Wu v. Liu*, 131 F.4th 1295, 1302 (11th Cir. 2025).

24-10797                Opinion of the Court                7

When the Convention's "four prerequisites are met and none of the Convention's affirmative defenses apply, then the district court must order arbitration." *Id.* (citation modified). Mr. Chemaly does not contest the second and fourth prerequisites.[3]

### III

Mr. Chemaly argues that the arbitration provision in his employment agreement cannot be enforced for two principal reasons. First, the arbitration provision is inconsistent with the choice-of-law and venue provision in the agreement, and the choice-of-law and venue provision governs. Second, the arbitration provision is unenforceable under domestic statutory and maritime law. These issues initially turn on whether R. Operations, as the signatory of Mr. Chemaly's employment contract, can compel arbitration. We then address whether the other defendants may compel arbitration.

### A

As an initial matter, Mr. Chemaly contends that our decisions in *Bautista*, 396 F.3d at 1292–303, and *Lindo v. NCL (Bahamas) Ltd.*, 652 F.3d 1257, 1272 (11th Cir. 2011), were abrogated by *GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 441 (2020). We disagree.

---

[3] The Convention recognizes three categories of affirmative defenses, set out in Article II(3). A court need not enforce an agreement to arbitrate if the agreement is "null and void, inoperative or incapable of being performed." *Bautista*, 396 F.3d at 1301.

In the Eleventh Circuit, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) (quoting *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008)). We have not overruled or abrogated *Bautista* or *Lindo* as a full court. Abrogation by the Supreme Court requires that the later decision from that Court "demolish and eviscerate each" of our prior decision's "fundamental props." *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (citation modified). As explained below, *Outokumpu* did not knock out each of the fundamental props on which *Bautista* and *Lindo* stand.

*Bautista* involved a boiler explosion on a cruise ship docked at the Port of Miami; the explosion injured four crewmembers and killed six. *See* 396 F.3d at 1292. Each crewmember's employment contract contained an arbitration provision under the law of the Philippines. *See id.* at 1293 n.3. Because § 1 of the Federal Arbitration Act expressly excludes "contracts of employment of seamen" from the reach of the FAA, the crewmembers argued that seamen's employment agreements should also be excluded from arbitration under the Convention. *See id.* at 1295 n.8 (quoting 9 U.S.C. § 1).

We concluded that seamen's employment agreements are commercial legal relationships under the Convention and are not subject to the FAA's seaman exception. *See id.* at 1296. Further, we held that the agreement was not null and void, in part because "[t]he limited scope of the Convention's null and void clause 'must

be interpreted to encompass only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale.'" *Id.* at 1302 (quoting *DiMercurio v. Sphere Drake Ins. PLC*, 202 F.3d 71, 80 (1st Cir. 2000)).

*Lindo* concerned a seaman who suffered a back injury on NCL's private island in the Bahamas after he was ordered to transport heavy trash bags to the ship. *See* 652 F.3d at 1260. The seaman's employment agreement contained an arbitration agreement, requiring arbitration of personal injury claims under Bahamian law. *See id.* at 1261. We rejected the seaman's argument that Jones Act claims are inarbitrable as a matter of public policy. *See id.* at 1268. We also held that a seaman "cannot raise an Article V public policy defense [under the New York Convention] at [the] initial arbitration-enforcement stage." *Id.* at 1282–83.

*Outokumpu* did not involve arbitration governed by a seaman's employment agreement. *See generally* 590 U.S. at 435. It instead concerned failing motors at a steel plant in Alabama; the agreement to provide the motors required that arbitration take place in Germany. *See Outokumpu Stainless USA, LLC v. Converteam SAS*, 902 F.3d 1316, 1321 (11th Cir. 2018). The Supreme Court addressed whether the Convention conflicts with the application of domestic-law equitable estoppel doctrines and concluded that it does not. *See Outokumpu*, 590 U.S. at 445. In so holding, the Supreme Court stated that "the Convention requires courts to rely on domestic law to fill the gaps; it does not set out a comprehensive regime that displaces domestic law." *Id.* at 441.

*Outokumpu* did not abrogate *Bautista* or *Lindo* because the Supreme Court did not consider whether Article II(3)'s null and void clause embraces the Jones Act and/or the FAA's seaman exception. *See id.* at 435. The reasoning in *Outokumpu*—that courts are to use domestic law to fill the gaps in the Convention—is admittedly in some tension with the statements in *Bautista* and *Lindo* that Article II(3) must be interpreted to encompass only those defenses recognized on an international scale. *Compare id.* at 445, *with Bautista*, 396 F.3d at 1302, *and Lindo*, 625 F.3d at 1273. But such tension is not enough to say that *Bautista* and *Lindo* have been undermined to the point of abrogation.

*Outokumpu* does not speak to Mr. Chemaly's argument that seamen's claims are exempt from arbitration under domestic law. *See* 590 U.S. at 435. We do not (and need not) rely on *Bautista*'s statement about defenses applicable on an international scale to resolve Mr. Chemaly's appeal. *Cf. Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 880 (11th Cir. 2023) (en banc) ("[I]n a case under the Convention where the United States is the primary jurisdiction—the jurisdiction where the arbitration was seated or whose law governed the conduct of the arbitration—the grounds for vacatur of an arbitral award are set out in domestic law . . . ."). We are bound by *Bautista* and its independent holding that the FAA's seaman exemption does not apply under the Convention. *See* 396 F.3d at 1296. We are also bound by the holding in *Lindo* that Congress did not carve out an exception to arbitrability for Jones Act claims. *See* 625 F.3d at 1287.

**B**

Next, we consider Mr. Chemaly's perceived conflict in his employment agreement. The agreement consisted of two separate documents. The first was titled the "Seafarer Employment Agreement," and the second was titled the "General Terms and Conditions."

Mr. Chemaly points to a provision of the "Seafarer Employment Agreement" that states as follows: "If there is any inconsistency between this Employment Agreement and the General Terms and Conditions, the terms of this Employment Agreement will prevail." D.E. 1-1 at 5. The arbitration provision is located in the "General Terms and Conditions." The "Employment Agreement" itself does not mention arbitration. It instead contains a venue and choice-of-law provision that reads: "This Employment Agreement and all matters (including, without limitation, any contractual or non-contractual obligation) arising from or connected with it are governed by, and will be construed in accordance with, the laws of the Cayman Islands. The parties submit to the exclusive jurisdiction of the courts of Cayman Islands." *Id.* at 6. Mr. Chemaly argues, based on this language, that there was no agreement to arbitrate because the choice-of-law provision in the Employment Agreement governs in the event of a conflict with the General Terms and Conditions. Thus, he maintains that the Convention's

first prerequisite—that there be an arbitration agreement in writing—is not satisfied.

"It is a cardinal principle of contract law that no term of a contract should be construed to be in conflict with another unless no other reasonable construction is possible." *United States v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998) (first citing *Guar. Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 999 (11th Cir. 1991), and then citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)). There are reasonable constructions that avoid a conflict in Mr. Chemaly's employment agreement. First, the parties could arbitrate the case, and then handle any disputes related to enforcement or confirmation of the award in the courts of the Cayman Islands. Second, as the defendants suggest, and Mr. Chemaly does not rebut, the agreement could be read to mean that this very suit—in which Mr. Chemaly argues that his claims are not arbitrable—should have been submitted to the exclusive jurisdiction of the courts of the Cayman Islands.

Contrary to Mr. Chemaly's preferred reading, the agreement does not say that all claims must be litigated (rather than arbitrated) in the Cayman Islands. Instead, it says that "[t]he parties submit to the exclusive jurisdiction of the courts of Cayman Islands." D.E. 1-1 at 5. *Cf. Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1297 (11th Cir. 2021) (contractual language providing that the parties "submit to the exclusive jurisdiction of the English Courts" and that the "courts of England shall have exclusive jurisdiction to adjudicate any dispute" arising out of or in connection

with the contract "unambiguously require an English forum"). In other words, if the parties elect to go to court first, it must be in the courts of the Cayman Islands. But the agreement does not require that the parties litigate all of their disputes in a court (rather than before an arbitrator).

The Convention's first prerequisite for a valid arbitration agreement concerns consent to arbitration. *See Outokumpu*, 590 U.S. at 447 (Sotomayor, J., concurring). The parties can consent to choice-of-law and venue for any claims, should they not be resolved at arbitration, without creating a conflict. *Cf. Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 64 (1995) (explaining that a choice-of-law provision and an arbitration provision do not "intrude[ ] upon" one another). In this case, one provision sets out the forum and law that the signatories chose (the Cayman Islands), while the other designates the tribunal that the signatories selected within that forum (an arbitrator rather than a court). Thus, the relevant contractual language—"[s]hould there be any dispute arising out of the Agreement, it shall be submitted for arbitration in the Cayman Islands"—constitutes an agreement to arbitrate in writing that satisfies the Convention's first prerequisite. *See* D.E. 1-1 at 17.

## C

Mr. Chemaly further argues that claims arising from a seaman's employment contract are not arbitrable, and thus any provision requiring arbitration of those claims would be null and void under domestic statutory and maritime law. He contends that a Jones Act claim is not "capable of settlement by arbitration" within

the meaning of the Convention. *See* Br. for Appellant at 17 (quoting New York Convention, Art. II(1)). He also asserts that the arbitration provision is null and void because it is contrary to general maritime law. *See id.* at 34.

Having already concluded that we are bound by our decisions in *Bautista* and *Lindo*, we endeavor to identify and faithfully apply their holdings. First, in *Bautista* we ruled that seamen's employment contracts are "commercial legal relationships" under the Convention, regardless of the FAA seamen exemption. *See* 396 F.3d at 1296. Second, we rejected in *Bautista* the contention that the Convention requires consideration of "the general solicitude for seamen reflected in the Jones Act." *Id.* at 1301. Third, in *Lindo* we held that Congress did not except Jones Act claims from arbitration. 652 F.3d at 1286–87. With these three principles in mind, we address Mr. Chemaly's arguments.

Article II(1) of the Convention provides:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

New York Convention, Art. II(1). In ratifying the Convention, the United States agreed that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction,

contract, or agreement described in section 2 of this title, falls under the Convention." 9 U.S.C. § 202.

Mr. Chemaly maintains that a Jones Act claim is not capable of settlement by arbitration. That, he says, is because it guarantees "a civil action at law, with the right of trial by jury, against the employer" and incorporates some of the protections of the Federal Employers' Liability Act. *See* 46 U.S.C. § 30104(a).[4]

Mr. Chemaly invokes a provision of FELA which states that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by [FELA] shall to that extent be void." 45 U.S.C. § 55. But he does not confront our conclusion in *Lindo* that § 55 is inapplicable to seamen's arbitration agreements.

Relying on *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 639 n.21 (1985), we recognized in *Lindo* that the language of Article II(1) "contemplates exceptions to arbitrability grounded in domestic law." 652 F.3d at 1286. So "courts may examine, at the arbitration-enforcement stage, whether *a type of statutory claim* cannot be submitted to arbitration," but "this subject-matter exception is a policy decision to be made by Congress, not

---

[4] We note that the plaintiffs in *Bautista* argued that "the underlying dispute [was] not arbitrable[,]" but we construed this argument as an invocation of Article II(3)'s carve-out for arbitration agreements "incapable of being performed." 396 F.3d at 1301–02. Here Mr. Chemaly invokes Article II(1) (in addition to Article II(3)) and thus makes a different argument that is not foreclosed by *Bautista*. But, as we explain, the argument lacks merit.

16                    Opinion of the Court                    24-10797

courts." *Id.* We also held that Congress has not created an exception to arbitrability for Jones Act claims. *See id.* at 1287. *Accord Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 272 (5th Cir. 2002) (rejecting the argument that Jones Act claims are not "capable of settlement by arbitration"); *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 119 (2d Cir. 2010) (concluding that an arbitration agreement was valid even if it "eliminated the seaman's choice to try his [Jones Act] case to a federal judge or jury, or a state court judge or jury") (internal quotation marks omitted). Thus, Mr. Chemaly's new Article II(2) argument is not persuasive.

Beyond the contention that a seaman's claims are not a matter capable of settlement by arbitration within the meaning of the Convention, all that remains was resolved by *Bautista* and *Lindo*. Mr. Chemaly's argument that arbitration clauses in seamen's employment agreements are generally unenforceable under domestic maritime law is foreclosed by those decisions. *See Bautista*, 396 F.3d at 1296–1300, 1302; *Lindo*, 652 F.3d at 1283–88.

In sum, the Convention's four prerequisites are satisfied with respect to the arbitration provision in Mr. Chemaly's employment agreement with R. Operations, and there are no viable affirmative defenses. Therefore, arbitration between Mr. Chemaly and R. Operations is required.[5]

---

[5] Mr. Chemaly also briefly argues that the arbitration provision is inapplicable because his "claims exist independent of a written employment agreement." Br. for Appellant at 12. To the extent this argument goes to the jurisdictional prerequisites (or an affirmative defense) as to R. Operations (rather than any

24-10797              Opinion of the Court              17

## IV

We generally review the applicability of equitable doctrines *de novo. See Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1316 (11th Cir. 2013).

## A

Having determined that arbitration between R. Operations and Mr. Chemaly (the two signatories of the employment contract) must be compelled, we turn to whether arbitration is required for the two non-signatory defendants—Mr. Lampert and Fountainhead Marine. Domestic equitable doctrines may allow the non-signatory defendants to enforce the provisions of the contract against Mr. Chemaly. *See Outokumpu*, 590 U.S. at 441. Because the district court compelled arbitration between Mr. Chemaly, Mr. Lampert, and Fountainhead Marine as to the Jones Act claim, the claim for failure to provide maintenance and cure, and the claim for failure to treat, these are the three claims we have jurisdiction to review.

A non-signatory may acquire rights under an arbitration agreement "if so dictated by the ordinary principles of contract and agency." 21 Williston on Contracts § 57:19 (4th ed. & May 2025

---

equitable estoppel arguments), Mr. Chemaly has abandoned it because he does not expand on it beyond its mention in the summary of the argument. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("Abandonment of a claim or issue can . . . occur when the passing references to it are made in the . . . summary of the argument, as occurred here.") (internal quotation marks and citations omitted).

update) (citations omitted). Mr. Lampert and Fountainhead Marine, the non-signatory defendants, invoke the equitable doctrines of estoppel and alter egos.

First, the doctrine of estoppel gives a non-signatory a right to enforce an arbitration agreement by precluding the signatory from taking inconsistent positions. *See MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009). "In essence, equitable estoppel precludes a party from claiming the benefits of some of the provisions of a contract while simultaneously attempting to avoid the burdens that some other provisions of the contract impose." *Bah. Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) (citation omitted).

Second, the doctrine of alter egos provides that "a party may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, when their conduct demonstrates a virtual abandonment of separateness." 21 Williston on Contracts § 57:19 (citing *Janvey v. Alguire*, 847 F.3d 231 (5th Cir. 2017)).

Article II(3) of the Convention provides:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of *one of the parties*, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

New York Convention, Art. II(3) (emphasis added). The final question is, then, who are the parties who can request arbitration?

The Supreme Court in *Outokumpu* instructed us to "to rely on domestic law to fill the gaps." 590 U.S. at 441. In this context, that means a non-signatory may rely on domestic equitable doctrines to enforce an arbitration agreement. *Id.* (citing *Carlisle*, 556 U.S. at 630). "[W]e assume without deciding that federal common law applies" because the parties here have done so. *See Usme v. CMI Leisure Mgmt.*, 106 F.4th 1079, 1087 (11th Cir. 2024) (citing *Bailey*, 705 F.3d at 1320).

**B**

We have recognized that an equitable estoppel theory allows a non-signatory to enforce the provisions of a contract against a signatory in two circumstances. *See Usme*, 106 F.4th at 1087. "The first is when the signatory to the contract relies on the terms of the contract to assert his or her claims against the non-party." *Id.* at 1087–88. "And the second is when the signatory raises allegations of interdependent and concerted misconduct by both the non-party and one or more of the signatories to the contract." *Id.* at 1088 (citing *Byers*, 701 F.3d at 1342).

The district court concluded that this second basis covered Mr. Chemaly's claims against the non-signatory defendants, and those defendants do not invoke the first ground on appeal. Mr. Chemaly contends that his claims are based on the borrowed servant doctrine, not the employment agreement, and this precludes the application of equitable estoppel.

For the second basis to apply, a signatory must allege "substantially interdependent and concerted misconduct by both the non[-]signatory and one or more of the signatories to the contract." *MS Dealer Serv. Corp.*, 177 F.3d at 947 (quoting *Boyd v. Homes of Legend*, 981 F. Supp. 1423, 1433 (M.D. Ala. 1997)). Interdependent means mutually dependent. Webster's New World College Dictionary 757 (5th ed. 2020). *Accord* The American Heritage Dictionary of the English Language 912 (4th ed. 2006) (meaning "[m]utually dependent"); 1 Shorter Oxford English Dictionary 1400 (5th ed. 2002) (meaning "dependent on each other"). Concerted action is "action that has been planned, arranged, and agreed on by parties acting together to further some scheme or cause, so that all involved are liable for the actions of one another." Black's Law Dictionary 363 (12th ed. 2024).

In a recent unpublished decision on which the district court relied, we imposed an additional requirement that the alleged misconduct must be "founded in or intimately connected with the obligations of the underlying agreement." *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 474 n.4 (11th Cir. 2021). *Northrup* relied on *Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1118–19 (11th Cir. 2020), which in turn applied California law. As a result, *Northrop* is not binding on us with respect to federal common law. *See Lavigne*, 967 F.3d at 1119 (quoting *Goldman v. KPMG, LLP*, 92 Cal. Rptr. 3d 534, 541 (Ct. App. 2009)).

In adopting the concerted misconduct circumstance, we have recognized that the ultimate goal of the estoppel inquiry is "to

determine whether those claims fall within the scope of the arbitration clause." *MS Dealer Serv. Corp.*, 177 F.3d at 947 (quoting *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 758 (11th Cir. 1993)). Thus, we consider whether (1) the plaintiff-signatory raises allegations of interdependent and concerted misconduct between the defendants (the signatory and the non-signatories); and (2) whether that misconduct gave rise to claims falling within the scope of the contract. *See Usme*, 106 F.4th at 1088; *MS Dealer Serv. Corp.*, 177 F.3d at 947. We apply this two-prong test to Mr. Chemaly's three claims: Jones Act negligence, failure to provide maintenance and cure, and failure to treat his injury.

**1**

"The Jones Act creates a cause of action for a seaman injured in the course of his employment by his employer's negligence . . . ." *Larue v. Joann M.*, 73 F.3d 325, 327 (11th Cir. 1996). A Jones Act claim is only against the seaman's employer for causing the injury, but in this Circuit a plaintiff may utilize the borrowed servant doctrine to hold his actual (rather than nominal) employer liable under the Act. *See Usme*, 106 F.4th at 1089 (first quoting *Cosmo. Shipping Co. v. McAllister*, 337 U.S. 783, 787 n.6 (1949), then citing *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 178 (5th Cir. Unit A Sept. 1981), and then citing *Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir. 1980)).

Mr. Chemaly's complaint is devoid of allegations that R. Operations, Fountainhead Marine, and Mr. Lampert worked *together* to become his Jones Act employer. Instead, Mr. Chemaly pled in

22                    Opinion of the Court                    24-10797

the alternative that if, in fact, R. Operations was not his Jones Act employer, then Fountainhead Marine was his Jones Act employer. If neither entity was his Jones Act employer, then Mr. Chemaly alternatively alleged that he was a borrowed servant of Mr. Lampert, giving rise to Jones Act liability against him.[6]

First, looking at Fountainhead Marine's role in the Sea Bob injury, Fountainhead Marine is the record owner of the yacht. The Jones Act employer is not always the shipowner, and Jones Act liability does not necessarily arise out of any negligence on the shipowner's behalf. *See Matute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 236 (3d Cir. 1991) ("Ordinarily, the shipowner is also the employer of the seamen. The employer, however, need not be the owner of the vessel."), *overruled on other grounds by Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166 (3d Cir. 1995). Additionally, Fountainhead Marine was responsible for training, supervising, and disciplining the yacht's crewmembers. But Mr. Chemaly does not connect any alleged negligent training or supervision with any act of Fountainhead Marine. Therefore, we see no basis to conclude that concerted action between Fountainhead Marine and R. Operations caused the Sea Bob injury.

---

[6] We note that Mr. Chemaly changed his position in his briefing and now states that he is a borrowed servant of Fountainhead Marine. Because the outcome would be the same under either theory, we assume that the complaint controls when contradicted by the brief's casting of the factual allegations. *See Gregory v. Electro-Mechanical Corp.*, 83 F.3d 382, 384 (11th Cir. 1996) ("Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal [theories] asserted.").

Second, turning to Mr. Lampert, we consider the interplay between the borrowed servant doctrine and the interdependent and concerted misconduct test. "The borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer." *Baker*, 656 F.2d at 178. When applying this doctrine, we look to the entity that was "actually directing" the seaman's work (not the employment agreement) to determine the Jones Act employer. *See Usme*, 106 F.4th at 1079 (quoting *Baker*, 656 F.2d at 178). Therefore, Jones Act claims under the borrowed servant doctrine "do not necessarily arise out of the crewmembers' employment agreements with the non-party entities." *Id.* (analyzing the first basis for estoppel (reliance on the agreement's terms)).

We think the same principle applies here, where there are no allegations specifically attributing the moment of the Sea Bob injury to Mr. Lampert—for example, Mr. Lampert is not alleged to have directed Captain Gold to pick up his radio. Indeed, the complaint states that Mr. Lampert was not on board the yacht at the time of Mr. Chemaly's injury. Moreover, the allegation that "[t]he yacht was not outfitted with a mechanical lifting device that would have allowed recovery of the Sea Bob from the water" is not specifically attributed to Mr. Lampert, and more dispositively, is not attributed to a mutual decision between Mr. Lampert and his company, R. Operations. *See* D.E. 1-2 ¶ 22. We decline to rule that estoppel requires us to compel arbitration merely because Mr. Lampert paid the operating expenses of R. Operations. There must be

more to show interdependent and concerted action that purportedly caused Mr. Chemaly's Jones Act injury.

In short, Mr. Chemaly does not allege that Mr. Lampert or Fountainhead Marine acted in concert with R. Operations to cause his Jones Act injury. That Mr. Chemaly pled the identity of the true Jones Act employer in the alternative does not mean that he alleged that all three acted in concert and interdependently.

**2**

Now on to Mr. Chemaly's claims for failure to provide maintenance, cure, and medical treatment. "Maintenance and cure are centuries old remedies under the general maritime law . . . designed to ensure the recovery of these individuals upon injury or sickness sustained in the service of the ship . . . ." *Nichols v. Barwick*, 792 F.2d 1520, 1523 (11th Cir. 1986) (quoting *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979)). Maintenance refers to a "*per diem* living allowance, paid so long as the seaman is outside the hospital and has not reached the point of 'maximum cure.'" *Id.* "Cure involves the payment of therapeutic, medical, and hospital expenses not otherwise furnished to the seaman . . . ." *Id.* at 1523–24. Mr. Chemaly's separate claim for failure to treat his injury arises out of a shipowner's "duty to provide prompt and adequate medical care to its seamen." *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 140 (5th Cir. 1986) (first citing *DeZon v. Am. President Lines, Ltd.*, 318 U.S. 660, 667–68 (1943), then citing *Joyce v. Atl. Richfield Co.*, 651 F.2d 676, 684 (10th Cir. 1981), and then citing *Picou v. Am. Offshore Fleet, Inc.*, 576 F.2d 585, 587 (5th Cir. 1978)).

A "shipowner's liability for maintenance and cure" is one of "'the most pervasive'" duties owed. *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962) (quoting *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730 (1943)). Indeed, "the duty to provide maintenance and cure 'is imposed by the law itself as one annexed to the employment.'" *Id.* at 532–33 (quoting *Cortes* v. *Balt. Insular Lines*, 287 U.S. 367, 371 (1932)). "Contractual it is in the sense that it has its source in a relation which is contractual in origin, but given the relation, no agreement is competent to abrogate the incident." *Id.* at 533.

Accordingly, unlike the Jones Act claim, which is necessarily tied to a negligent act or omission by the Jones Act employer, a maintenance and cure claim contemplates a broad duty owed by the shipowner. *See Pelotto*, 604 F.2d at 400 ("Maintenance and cure are due without regard to the negligence of the employer . . . ."). In his complaint, Mr. Chemaly does not distinguish between R. Operations and the other defendants in those specific paragraphs relating to the failure to provide maintenance and cure claim or the failure to treat claim. Despite alleging that the Jones Act injury was attributable to one of the three defendants in the alternative, he attributes the delay, failure, and refusal to provide maintenance, cure, and medical treatment to the "[d]efendants." D.E. 1-2 ¶¶ 47–50, 52–55.

There is a common relationship between R. Operations, Fountainhead Marine, and Mr. Chemaly when it comes to his care post-injury. For example, Mr. Chemaly alleges that he "was ordered" to forgo pain medication, "was put on night shifts so the

yacht guest would not see him in his sling[,]" and "was ordered to do washdowns of the yacht and teak cleaning/repair, all of which resulted in further injury and aggravation of his shoulder." *Id.* ¶¶ 24–26. This alleged misconduct—whether the orders came from Captain Gold or Mr. Lampert—arises out of the tripartite relationship between Fountainhead Marine as the shipowner, R. Operations as Mr. Chemaly's employer, and Mr. Lampert as the representative of those two entities. Moreover, Mr. Chemaly alleges that all three defendants were aware of his injury and nevertheless took these aggravating actions.

To the extent R. Operations breached its duty to provide maintenance, cure, and treatment, its actions are indistinguishable from the actions of Fountainhead Marine and Mr. Lampert which allegedly exacerbated Mr. Chemaly's injury. The interdependent sequence of events—R. Operations hiring Mr. Chemaly, followed by the exacerbation of injuries giving rise to potential liability by Fountainhead Marine and Mr. Lampert under the broad duty of maintenance and cure—makes it not only fair but also plainly logical that the three entities would acquire the right to arbitrate based on the common breach. *See, e.g., Byers*, 701 F.3d at 1342 ("The doctrine of equitable estoppel is grounded in fairness.").

These two claims only exist because of Mr. Chemaly's status as a seafarer and the attendant maritime duties owed. They thus fall within the scope of the arbitration agreement. *See* D.E. 1-1 at 17 (covering "any dispute arising out of the Agreement"). Because Mr. Chemaly raised allegations of substantially interdependent and

concerted misconduct between the three defendants for these two causes of action, he cannot thwart the arbitration provision in his contract with R. Operations. Thus, we affirm the district court's decision to compel arbitration as to the claims for maintenance and cure and failure to treat.

## C

"A parent corporation is not bound by an arbitration agreement signed by its subsidiary, but to which the parent was neither a party nor a signatory, absent a showing that the parent was an alter ego of the subsidiary." 20 Williston on Contracts § 56:29 (citing Fletcher Cyclopedia of Law of Corporations § 41.10 (Perm. Ed. 2025)).

Although it is true that "[w]e may affirm on any ground supported by the record as long as that ground was properly asserted[,]" *Hogan v. Sec'y, U.S. Dep't of Veterans Affs.*, 121 F.4th 172, 176 (11th Cir. 2024) (citation omitted), the non-signatory defendants here did not advance the alter ego theory below as a basis to compel arbitration. And whether "the alter ego theory applies in a given case presents a question of fact." 20 Williston on Contracts § 55:19. Our decision whether to alternatively affirm on this ground is a matter of discretion. *See United States v. Campbell*, 26 F.4th 860, 879 (11th Cir. 2022) (en banc).

Mr. Chemaly's complaint alleges that both R. Operations and Fountainhead Marine are essentially shell companies funded by Mr. Lampert and thus are his alter egos. But whether they fit

the legal definition of an alter ego such that R. Operations' signature allows Fountainhead Marine and Mr. Lampert the right to enforce the arbitration provision against Mr. Chemaly cannot simply turn on that conclusory allegation. *See U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) ("When we rule on motions to compel arbitration, we look to the facts alleged in the complaint. But we may ignore the legal labels that [the plaintiff] assigns to the allegations . . . .")(citation modified)). Significantly, the declarations in the record did not discuss the corporate structure between Mr. Lampert and the two entities. Likewise, there is nothing in the record about the corporate relationship between Fountainhead Marine and R. Operations to decide whether R. Operations could bind Fountainhead Marine or give it contractual rights.

We decline to exercise our discretion to consider the alter ego theory and engage in fact-finding in the first instance. Simply stated, the non-signatory defendants did not assert this theory below, thereby forfeiting it, and there are no extraordinary circumstances that warrant consideration of the issue. *See Gould v. Interface, Inc.*, 153 F.4th 1346, 1356, 1357–58 (11th Cir. 2025) (stating that "parties can forfeit positions or issues that they fail to properly raise at the district court," and if "a party advances an altogether new interpretation of a legal text on appeal—different from the one he embraced in the district court—he impermissibly raises a new issue").

## V

Finally, in their cross-appeal, the defendants ask us to hold that arbitration must be compelled as to the unseaworthiness claim and the claims against Camper and Captain Gold—all of which the district court remanded. The defendants acknowledge that our decision in *Wu*, 131 F.4th at 1302, holds that we lack jurisdiction over such an appeal, but they maintain *Wu* was wrongly decided.

As a later panel, we cannot ignore *Wu*. Because we do not have jurisdiction over the remand order, we dismiss the cross-appeal for lack of subject-matter jurisdiction.

## VI

To summarize, we affirm the district court's order to the extent it allowed (1) R. Operations to compel arbitration of Mr. Chemaly's Jones Act negligence claim (Count I), failure to provide maintenance and cure claim (Count III), and failure to treat claim (Count IV); and (2) Fountainhead Marine and Mr. Lampert to compel arbitration of Mr. Chemaly's failure to provide maintenance and cure claim (Count III), and failure to treat claim (Count IV).

We reverse the district court's order to the extent it allowed Fountainhead Marine and Mr. Lampert to compel arbitration of the Jones Act negligence claim (Count I).

We lack jurisdiction to review the district court's remand order, which remanded to state court Mr. Chemaly's (1) unseaworthiness claim against R. Operations, Fountainhead Marine, and Mr. Lampert (Count II), (2) negligence claim against Camper (Count

V), (3) conversion claim against all defendants (Count VI), and (4) breach of insurance contract claim against Camper and Catlin (Count VII). Accordingly, we dismiss the defendants' cross-appeal as to the remanded claims.

**DISTRICT COURT ORDER AFFIRMED in part and REVERSED in part; DEFENDANTS' CROSS-APPEAL DISMISSED.**

24-10797  HULL, J., Concurring in Part and Dissenting in Part    1

HULL, Circuit Judge, Concurring in part and Dissenting in part:

I concur in full in the Court's opinion, except as for Part IV.B.1. Specifically, I concur in affirming the district court's order allowing (1) defendant R. Operations to compel arbitration of Mr. Chemaly's Jones Act negligence claim (Count I); and (2) allowing defendants R. Operations, Fountainhead Marine, and Mr. Lampert to compel arbitration of Mr. Chemaly's maintenance and cure claim (Count III) and failure to treat claim (Count IV). However, I do not join Part IV.B.I, which reverses the district court's ruling that Fountainhead Marine and Mr. Lampert could compel arbitration of Mr. Chemaly's Jones Act claim (Count I). In my view, Fountainhead Marine and Mr. Lampert also can compel arbitration of the Jones Act claim under an equitable estoppel theory.

Equitable estoppel allows non-signatories to enforce provisions of a contract against a signatory when, as relevant here, "the signatory raises allegations of interdependent and concerted misconduct by both the non-party and one or more of the signatories to the contract." *Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1087-88 (11th Cir. 2024). The Court concludes today that Mr. Chemaly's maintenance and cure claim (Count III) and failure to treat claim (Count IV) satisfy this standard and may be compelled to arbitration by non-signatories Fountainhead Marine and Mr. Lampert. I would reach the same result for the Jones Act claim (Count I) too.

2       HULL, J., Concurring in Part and Dissenting in Part  24-10797

As in his other claims, Mr. Chemaly's Jones Act-related allegations do not distinguish between signatory R. Operations and non-signatories Fountainhead Marine and Mr. Lampert. Instead, Mr. Chemaly's Jones Act claim similarly attributes a litany of negligent acts to the "[d]efendants." Additionally, his Jones Act claim is based in part on the defendants' "[f]ailure to provide prompt, proper, and adequate medical care," an alleged breach of duty that arises from the same conduct underlying the failure to treat claim. Both claims thus rest on interdependent and concerted misconduct between signatories and non-signatories to the employment agreement.

It is true that Mr. Chemaly pleads in the alternative and separately names R. Operations, Fountainhead Marine, and Mr. Lampert each as a possible Jones Act employer for his Jones Act claim in Count I. That alternative pleading is permissible and reflects that Mr. Chemaly can hold only one Jones Act employer liable for Jones Act negligence. *See Spinks v. Chevron Oil Co.*, 507 F.2d 216, 225 (5th Cir. 1975) ("We see nothing offensive in suing an immediate employer under the Act, or even both employers in the alternative."), *overruled in part on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997); *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 791 (1949) (stating that "under the Jones Act only one person, firm, or corporation can be sued as employer"). While Mr. Chemaly's allegations separate out who may be liable for his Jones Act claim, any liability of the defendants arises from the same alleged misconduct. In my view,

24-10797  Hull, J., Concurring in Part and Dissenting in Part    3

the acts of signatory R. Operations are indistinguishable from the acts of Fountainhead Marine and Mr. Lampert.

Thus, I concur in full in the Court's opinion except for Part IV.B.1, from which I respectfully dissent.